*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

THOMAS MORE LAW CENTER; JANN
DEMARS;
JOHN CECI; STEVEN HYDER; SALINA HYDER,
                              *Plaintiffs-Appellants,*

                    *v.*

BARACK HUSSEIN OBAMA, in his official
capacity as President of the United States;
KATHLEEN SEBELIUS, in her official capacity
as Secretary, United States Department of
Health and Human Services; ERIC H.
HOLDER, JR., in his official capacity as
Attorney General of the United States;
TIMOTHY F. GEITHNER, in his official
capacity as Secretary, United States
Department of Treasury,
                              *Defendants-Appellees.*

No. 10-2388

> Appeal from the United States District Court
> for the Eastern District of Michigan at Detroit.
> No. 10-11156—George C. Steeh, District Judge.

Argued: June 1, 2011

Decided and Filed: June 29, 2011

Before: MARTIN and SUTTON, Circuit Judges; GRAHAM, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Robert J. Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, for Appellants. Neal Kumar Katyal, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Robert J. Muise, THOMAS MORE LAW CENTER, Ann Arbor, Michigan, David Yerushalmi, LAW OFFICES OF DAVID YERUSHALMI, P.C., Chandler, Arizona, for Appellants. Neal Kumar Katyal, Mark B.

_____

[*]The Honorable James L. Graham, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

Stern, Alisa B. Klein, Anisha Dasgupta, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. Edward L. White, AMERICAN CENTER FOR LAW AND JUSTICE, Ann Arbor, Michigan, Steven J. Lechner, Joel M. Spector, MOUNTAIN STATES LEGAL FOUNDATION, Lakewood, Colorado, Ilya Shapiro, Robert A. Levy, David H. Rittgers, CATO INSTITUTE, Washington, D.C., Cory L. Andrews, WASHINGTON LEGAL FOUNDATION, Washington, D.C., Steven J. Willis, UNIVERSITY OF FLORIDA COLLEGE OF LAW, Gainesville, Florida, Catherine E. Stetson, HOGAN LOVELLS US LLP, Washington, D.C., Kristin M. Houser, SCHROETER, GOLDMARK & BENDER, Seattle, Washington, Keith S. Dubanevich, OREGON DEPARTMENT OF JUSTICE, Salem, Oregon, Walter E. Dellinger, Washington, D.C., Ian R. Millhiser, CENTER FOR AMERICAN PROGRESS, Washington, D.C., John L. Longstreth, Molly K. Suda, K&L GATES LLP, Washington, D.C., Rochelle Bobroff, NATIONAL SENIOR CITIZENS LAW CENTER, Washington, D.C., Richard L. Rosen, ARNOLD & PORTER LLP, Washington, D.C., Charles A. Rothfeld, MAYER BROWN, Washington, D.C., for Amici Curiae.

MARTIN, J., delivered the opinion of the court, in which SUTTON, J., and GRAHAM, D. J., concurred as to Parts I (background) and II (subject matter jurisdiction) and in which SUTTON, J., concurred in the judgment. SUTTON, J. (pp. 27–53), delivered the opinion of the court as to Part I (taxing power) of his opinion, in which GRAHAM, D. J., joins. GRAHAM, D. J. (pp. 54–64), delivered a separate opinion concurring in part and dissenting in part.

--------

## OPINION

--------

BOYCE F. MARTIN, JR., Circuit Judge. This is an appeal from the district court's determination that the minimum coverage provision of the Patient Protection and Affordable Care Act[1] is constitutionally sound. Among the Act's many changes to the national markets in health care delivery and health insurance, the minimum coverage provision requires all applicable individuals to maintain minimum essential health insurance coverage or to pay a penalty. 26 U.S.C. § 5000A.

--------

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010), amended by the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029.

Plaintiffs include Thomas More Law Center, a public interest law firm, and four individuals: Jann DeMars, John Ceci, Steven Hyder, and Salina Hyder.[2] The individual plaintiffs are United States citizens, Michigan residents, and federal taxpayers who claim that the minimum coverage provision unconstitutionally compels them to purchase health insurance. Thomas More does not assert any injury to itself as an organization or employer, but rather objects to the provision on behalf of its members.

Plaintiffs sought a declaration that Congress lacked authority under the Commerce Clause to pass the minimum coverage provision, and alternatively a declaration that the penalty is an unconstitutional tax. The district court held that the minimum coverage provision falls within Congress's authority under the Commerce Clause for two principal reasons: (1) the provision regulates economic decisions regarding how to pay for health care that have substantial effects on the interstate health care market; and (2) the provision is essential to the Act's larger regulation of the interstate market for health insurance. Because the district court found the provision to be authorized by the Commerce Clause, it declined to address whether it was a permissible tax under the General Welfare Clause. The district court denied plaintiffs' motion for a preliminary injunction, and they appeal.

This opinion is divided into several parts. First, it provides background on the Affordable Care Act and the minimum coverage provision. Second, it addresses this Court's jurisdiction. Third, it considers whether the provision is authorized by the Commerce Clause of the Constitution. Fourth, it declines to address whether the provision is authorized by the General Welfare Clause. We find that the minimum coverage provision is a valid exercise of legislative power by Congress under the Commerce Clause and therefore **AFFIRM** the decision of the district court.

---

[2]Jann DeMars and Steven Hyder are members of Thomas More, while John Ceci and Salina Hyder are not.

## I. BACKGROUND

Congress found that the minimum coverage provision is an essential cog in the Affordable Care Act's comprehensive scheme to reform the national markets in health care delivery and health insurance. The Act contains five essential components designed to improve access to the health care and health insurance markets, reduce the escalating costs of health care, and minimize cost-shifting. First, the Act builds upon the existing nationwide system of employer-based health insurance. It establishes tax incentives for small businesses to purchase health insurance for their employees, 26 U.S.C. § 45R, and requires certain large employers to offer health insurance to their employees, *id.* § 4980H. Second, the Act provides for the creation of state-operated "health benefit exchanges." These exchanges allow individuals and small businesses to leverage their collective buying power to obtain price-competitive health insurance. 42 U.S.C. § 18031. Third, the Act expands federal programs to assist the poor with obtaining health insurance. For eligible individuals who purchase insurance through an exchange, the Act offers federal tax credits for payment of health insurance premiums, 26 U.S.C. § 36B, and authorizes federal payments to help cover out-of-pocket expenses, 42 U.S.C. § 18071. The Act also expands eligibility for Medicaid. *Id.* § 1396a(a)(10)(A)(i)(VIII). Fourth, the Act bars certain practices in the insurance industry that have prevented individuals from obtaining and maintaining health insurance. The guaranteed issue requirement bars insurance companies from denying coverage to individuals with pre-existing conditions, *id.* §§ 300gg-1(a), 300gg-3(a), and the community rating requirement prohibits insurance companies from charging higher rates to individuals based on their medical history, *id.* § 300gg.

Finally, the Act's "Requirement to Maintain Minimum Essential Coverage," 26 U.S.C. § 5000A, takes effect in 2014 and requires every "applicable individual" to obtain "minimum essential coverage" for each month. The Act directs the Secretary of Health and Human Services in coordination with the Secretary of the Treasury to define the required essential health benefits, which must include at least ten general categories of services. 42 U.S.C. § 18022(b)(1).

Applicable individuals who fail to obtain minimum essential coverage must include with their annual federal tax payment a "shared responsibility payment," which is a "penalty" calculated based on household income. 26 U.S.C. § 5000A(b), (c). The Act exempts from its penalty provision certain individuals, including those deemed to suffer a hardship with respect to their capability to obtain coverage. *Id.* § 5000A(e).

A number of Congressional findings accompany the minimum coverage requirement. Congress determined that "the Federal Government has a significant role in regulating health insurance," and "[t]he requirement is an essential part of this larger regulation of economic activity." 42 U.S.C. § 18091(a)(2)(H). Congress found that without the minimum coverage provision, other provisions in the Act, in particular the guaranteed issue and community rating requirements, would increase the incentives for individuals to "wait to purchase health insurance until they needed care." *Id.* § 18091(a)(2)(I). This would exacerbate the current problems in the markets for health care delivery and health insurance. *See id.* Conversely, Congress found that "[b]y significantly reducing the number of the uninsured, the [minimum coverage] requirement, together with the other provisions of this Act, will lower health insurance premiums." *Id.* § 18091(a)(2)(F). Congress concluded that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." *Id.* § 18091(a)(2)(I).

## II.  DOES THIS COURT HAVE JURISDICTION OVER PLAINTIFFS' CLAIM?

**A. Standing and Ripeness**

Our first duty is to determine whether this is a "case or controversy" within the meaning of Article III of the Constitution such that we have judicial power to review this issue. *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). "We review issues of justiciability pursuant to Article III *de novo*." *Id.* at 278. Standing requires plaintiffs to demonstrate "actual present harm or a significant possibility of future harm." *Id.* at 279. "[T]he presence of one party with standing is sufficient to

satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006). An issue must be ripe, or ready for review, before we act. "Ripeness requires that the injury in fact be certainly impending." *Nat'l Rifle Ass'n of Am.*, 132 F.3d at 280 (internal quotation marks and citation omitted).

Article III gives claimants standing to file a lawsuit in federal court if they establish injury, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). There is little to talk about with respect to the last two requirements: The United States caused the alleged injury by enacting the minimum coverage provision, and a favorable decision would redress the injury by invalidating the provision. There is more to talk about with respect to the injury requirement.

There are two potential theories of injury—"actual" present injury and "imminent" future injury, *id.* at 560—and plaintiffs satisfy both of them. As to actual injury, the declarations of Ceci and Steven Hyder show that the impending requirement to buy medical insurance on the private market has changed their present spending and saving habits. *See* John Ceci May 27, 2011 Decl. ¶¶ 7–8; Steven Hyder May 28, 2011 Decl. ¶ 8.

Ceci and Steven Hyder filed these declarations, it is true, after a third plaintiff, Jann DeMars, obtained private insurance during this appeal. These new declarations do not contradict anything that Ceci and Steven Hyder said in their earlier declarations, and there is nothing exceptional, or for that matter surprising, about the contents of them, which largely parallel the original DeMars declaration. The United States concedes that the original DeMars declaration established injury, Gov't Letter Br. to this Court, at 3-5, as the district court concluded and we agree.

That leaves the objection to our consideration of the new declarations that they were filed during the pendency of this appeal. This development, however, occurred in response to another development during the appeal—the United States's motion to dismiss filed in the aftermath of DeMars's disclosure that she had obtained medical insurance. Out of an abundance of caution, we could remand the case to the district

court to permit testimony and cross-examination about the contents of the declarations. However, the United States offers no reason to believe that anything in the declarations is untrue, and we cannot think of any such reason ourselves. The Federal Rules of Appellate Procedure permit the filing of affidavits on appeal, particularly in response to a motion filed by an opposing party, and so do court decisions in settings similar to this one. *See* Fed. R. App. P. 10(e); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170-71 (11th Cir. 2006); *Cabalceta v. Standard Fruit Co.*, 883 F.2d 1553, 1554-55, 1560 (11th Cir. 1989); *cf. United States v. Murdock*, 398 F.3d 491, 500 (6th Cir. 2005).

*Summers v. Earth Island Institute*, 555 U.S. 488, 129 S. Ct. 1142 (2009), does not change matters. There, "[a]fter the District Court had entered judgment, and after the Government had filed its notice of appeal, respondents submitted additional affidavits to the District Court." *Id.* at 1150 n.*. The Court did not consider the affidavits because "respondents had not met the challenge to their standing at the time of judgment [and] could not remedy the defect retroactively." *Id.* No such problem arose here. In this case, the plaintiffs "met the challenge to their standing at the time of judgment," and indeed the United States did not challenge that judgment on appeal. Only after DeMars purchased insurance and after the appeal had been filed did the United States file its motion to dismiss.

In addition to establishing a present actual injury, plaintiffs have shown imminent injury—"that the threatened injury is certainly impending." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Imminence is a function of probability. And probabilities can be measured by many things, including the certainty that an event will come to pass. The uncertainty that the event will come to pass may be based on developments that may occur during a gap in time between the filing of a lawsuit and a threatened future injury. *See 520 S. Mich. Ave. Assocs., Ltd. v. Devine*, 433 F.3d 961, 962 (7th Cir. 2006) ("Standing depends on the probability of harm, not its temporal proximity.").

On March 23, 2010, Congress passed a law that goes into effect on January 1, 2014. As the plaintiffs see it, the law requires them to do something that the

Constitution prohibits: require that they buy and maintain a minimum amount of medical insurance. When the plaintiff is an object of the challenged action "there is ordinarily little question that the action or inaction has caused him injury." *Defenders of Wildlife*, 504 U.S. at 561-62.

The only developments that could prevent this injury from occurring are not probable and indeed themselves highly speculative. Plaintiffs, true enough, could leave the country or die, and Congress could repeal the law. But these events are hardly probable and not the kinds of future developments that enter into the imminence inquiry. *Riva v. Massachusetts*, 61 F.3d 1003, 1011 (1st Cir. 1995) ("The demise of a party or the repeal of a statute will always be possible in any case of delayed enforcement, yet it is well settled that a time delay, without more, will not render a claim of statutory invalidity unripe if the application of the statute is otherwise sufficiently probable.").

Plaintiffs also could buy insurance between the passage of the law and its effective date. This is less speculative, as underscored by the reality that one of the individual plaintiffs purchased insurance during the last year. But it makes no difference to the imminence inquiry because one of plaintiffs' theories is that Congress may not force individuals to buy *or maintain* private insurance.

Plaintiffs also could become exempt from the requirement because their income could fall below the tax filing threshold or a disaster could befall them, making them eligible for the hardship exception. This, too, is not probable, particularly when it comes to all three individual plaintiffs, to say nothing of all of the members of Thomas More Law Center.

In settings like this one, the Supreme Court has permitted plaintiffs to challenge laws well before their effective date. The Court has allowed challenges to go forward even though the complaints were filed almost six years and roughly three years before the laws went into effect. *See New York v. United States*, 505 U.S. 144, 153-54 (1992); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 530, 536 (1925); *see also Village of Bensenville v. Fed. Aviation Admin.*, 376 F.3d 1114, 1119 (D.C. Cir. 2004) (over thirteen years). While the point does not come up often, as most laws have immediate effective dates,

these decisions establish that a lawsuit filed roughly three and a half years before the effective date of the law is not out of the ordinary.

Although *Pierce* and *New York* speak of justiciability only in terms of ripeness, their reasoning applies equally to standing here. At least in this context, where the only Article III question concerns the imminence of the plaintiffs' injury, standing analysis parallels ripeness analysis. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 81 (1978) ("To the extent that issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,' our conclusion that appellees will sustain immediate injury . . . and that such injury would be redressed by the relief requested would appear to satisfy this requirement." (internal quotation marks omitted)); *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1974) ("The standing question . . . bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention . . . ."). Indeed if a defendant's "ripeness arguments concern only" the "requirement that the injury be imminent rather than conjectural or hypothetical" then "it follows that our analysis of [the defendant's] standing challenge applies equally and interchangeably to its ripeness challenge." *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006). Whether viewed through the lens of standing or of ripeness, the plaintiffs' challenge meets the requirements of Article III, especially in the context of a pre-enforcement facial challenge.

In view of the probability, indeed virtual certainty, that the minimum coverage provision will apply to the plaintiffs on January 1, 2014, no function of standing law is advanced by requiring plaintiffs to wait until six months or one year before the effective date to file this lawsuit. There is no reason to think that plaintiffs' situation will change. And there is no reason to think the law will change. By permitting this lawsuit to be filed three and one-half years before the effective date, as opposed to one year before the effective date, the only thing that changes is that all three layers of the federal judiciary will be able to reach considered merits decisions, as opposed to rushed interim (*e.g.*, stay) decisions, before the law takes effect. The former is certainly preferable to the latter, at least in the current setting of this case.

Nor is their claim insufficiently "concrete and particularized." *Defenders of Wildlife*, 504 U.S. at 560. While "'some day' intentions" to travel somewhere or to do something that might implicate a federal law "do not support a finding of the 'actual or imminent' injury" that the cases demand, *id.* at 564, plaintiffs' situations are not nearly so ephemeral. There is no trip that must be taken, no ticket that must be purchased, before the injury occurs. *See id.* at 564 n.2. The plaintiffs claim a constitutional right to be free of the minimum coverage provision, and the only thing saving them from it at this point is two and a half more years and an exceedingly concrete "some day": January 1, 2014. *See* 26 U.S.C. § 5000A(a).

*McConnell v. Federal Election Commission*, 540 U.S. 93 (2003), does not undermine this conclusion. There the Court ruled that several plaintiffs did not have standing to challenge a provision of the Bipartisan Campaign Reform Act because their "alleged injury . . . [was] too remote temporally." *Id.* at 226. The *McConnell* plaintiffs filed a lawsuit in March 2002, 251 F. Supp. 2d 176, 206 (D.D.C. 2003), and "the earliest day [McConnell] could be affected by [the challenged provision was] 45 days before the Republican primary in 2008." 540 U.S. at 226. The Court, however, could not know whether the plaintiffs would even suffer an injury six years later. *Id.* The challenged provision would affect the *McConnell* plaintiffs only if the following things happened in an election six years later: (1) a challenger ran in the primary or election; (2) the plaintiff created an advertisement mentioning the challenger; (3) the advertisement did not identify the plaintiff by name; and (4) the broadcasters attempted to charge McConnell more than their lowest unit rate for his ads. *Id.* at 224-25. A candidate cannot guarantee (much less prove) that another person will run against him six years down the road or that a broadcaster will offer him a less than favorable price, and it is unknowable what type of political advertisements the candidate will run when the time comes.

The plaintiffs have no similar problem in this case. The Act itself proves they will be required to purchase insurance and maintain it when the time comes. Unlike the *McConnell* plaintiffs, who had not taken any action that would subject them to the Act,

the plaintiffs need not do anything to become subject to the Act.  That, indeed, is their key theory—that mere "existence" should not be a basis for requiring someone to buy health insurance on the private market.  Plaintiffs have standing to bring this claim.

**B. Anti-Injunction Act**

The United States and the plaintiffs now agree that the Anti-Injunction Act does not bar this action.  Yet because this limitation goes to the subject matter jurisdiction of the federal courts, the parties' agreement by itself does not permit us to review this challenge.  26 U.S.C. § 7421(a); *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 & n.11 (2006).

The Anti-Injunction Act says that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court."  26 U.S.C. § 7421(a).  In language "at least as broad as the Anti-Injunction Act," *Bob Jones Univ. v. Simon*, 416 U.S. 725, 732 n.7 (1974), the Declaratory Judgment Act forbids declaratory judgment actions "with respect to Federal taxes."  28 U.S.C. § 2201(a).

The relevant terminology suggests that we may hear this action.  While the Anti-Injunction Act applies only to "tax[es]," 26 U.S.C. § 7421(a), Congress called the shared-responsibility payment a "penalty."  *See id.* § 5000A.  In many contexts, the law treats "taxes" and "penalties" as mutually exclusive.  *See, e.g.*, *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 220 (1996) (determining whether, under section 507(a)(7) of the Bankruptcy Code, a particular exaction was "a 'tax' []as distinct from a . . . penalty"); *Dep't of Revenue of Mont. v. Kurth Ranch*, 511 U.S. 767, 784 (1994) (determining that a provision labeled a "tax" was a penalty and therefore barred by the Double Jeopardy Clause); *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38 (1922) (construing Congress's taxing power under Article I, § 8, cl. 1, based on "[t]he difference between a tax and a penalty").  Congress's choice of words—barring litigation over "tax[es]" in section 7421 but imposing a "penalty" in section 5000A—suggests that the former does not cover the latter.

Other provisions of the Internal Revenue Code, to be sure, show that *some* "penalties" amount to "taxes" for purposes of the Anti-Injunction Act. Not surprisingly, for example, chapter 68 of the Revenue Code imposes "penalties" on individuals who fail to pay their "taxes." 26 U.S.C. § 6651. Less obviously, but to similar effect, subchapter B of chapter 68 of the Revenue Code imposes other "penalties" related to the enforcement of traditional taxes. *See, e.g.*, *id.* § 6676 (penalty for erroneously claiming refunds); *id.* § 6704 (penalty for failing to keep certain records). Under section 6671, "any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by [subchapter B of chapter 68]." *See also id.* §§ 6201; 6665(a)(2). All of these "penalties" thus count as "taxes," including for purposes of the Anti-Injunction Act. *See Herring v. Moore*, 735 F.2d 797, 798 (5th Cir. 1984) (per curiam); *Souther v. Mihlbachler*, 701 F.2d 131, 132 (10th Cir. 1983) (per curiam); *Prof'l Eng'rs, Inc. v. United States*, 527 F.2d 597, 599 (4th Cir. 1975). Otherwise, the recalcitrant tax protester could sue to preempt collection of a substantial monetary charge (accumulated penalties and interest) but not what will often be a smaller charge (the tax owed).

None of this affects the shared-responsibility payment, a penalty triggered by failure to comply with the minimum coverage provision. Section 5000A is not a penalty "provided by" chapter 68 of the Revenue Code. Congress placed the penalty in chapter 48 of the Revenue Code, and it did not include a provision treating the penalty as a "tax" in the title, as it did with penalties provided in chapter 68. Distinct words have distinct meanings. Congress said one thing in sections 6665(a)(2) and 6671(a), and something else in section 5000A, and we should respect the difference. That is particularly so where, as here, Congress had a reason for creating a difference: Unlike the penalties listed in chapter 68, the shared responsibility payment has nothing to do with tax enforcement. *Cf. Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1362 n.5 (11th Cir. 2003) (holding that "tax penalties imposed for substantive violations of laws not directly related to the tax code" do not implicate the Anti-Injunction Act).

Section 5000A(g)(1), it is true, says that "[t]he penalty provided by this section shall be paid upon notice and demand by the Secretary, and . . . shall be assessed and collected in the same *manner* as an assessable penalty under subchapter B of chapter 68." 26 U.S.C. § 5000A(g)(1) (emphasis added). The assessable penalties under subchapter B in turn "shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes." *Id.* § 6671(a). In the context of a shared-responsibility payment to the United States for failing to buy medical insurance, however, the most natural reading of the provision is that the "manner" of assessment and collection mentioned in sections 5000A(g)(1) and 6671(a) refers to the mechanisms the Internal Revenue Service employs to enforce penalties, not to the bar against pre-enforcement challenges to taxes.

The same is true of other provisions in the Code treating penalties as taxes. All that section 6665(a)(2) and section 6671(a) show is that Congress intended to treat *certain* penalties as "taxes" in *certain* contexts. To read these provisions loosely to suggest that every penalty is a "tax" would render each particular provision superfluous. That conclusion makes all the more sense in the context of the Affordable Care Act, which prohibits the Internal Revenue Service from using the customary tools available for collecting taxes and penalties, the very tools the Anti-Injunction Act was enacted to protect. *See Bob Jones Univ.*, 416 U.S. at 736. In collecting the health care penalty, the Internal Revenue Service may not impose liens on an individual's property, place levies on an individual's pay, or bring criminal charges. 26 U.S.C. § 5000A(g)(2)(B). All that the Internal Revenue Service may do is one of two things. It may deduct past-due penalties from future tax refunds, a form of enforcement exceedingly unlikely to implicate the Anti-Injunction Act. Or it may bring a collection action, which most individuals would be unlikely to preempt—in truth invite—by bringing their own lawsuit. Last of all, because the minimum coverage provision does not come into effect until 2014 (and the penalty could not be assessed or collected until at least a year later), this lawsuit will hardly interfere with the "Government's need to assess and collect taxes as expeditiously as possible." *Bob Jones Univ.*, 416 U.S. at 736. Here, the Anti-Injunction Act does not remove our jurisdiction to consider this claim.

### III. IS THE MINIMUM COVERAGE PROVISION A CONSTITUTIONAL EXERCISE OF CONGRESS'S COMMERCE POWER?

The question squarely presented here is whether the minimum coverage provision is consistent with the Commerce Clause of the Constitution. We review de novo plaintiffs' constitutional challenge to the provision. *See United States v. Bowers*, 594 F.3d 522, 527 (6th Cir. 2010). At the outset, it is important to note that our elected officials and the public hotly debated the merits and weaknesses of the Act before Congress voted, and will undoubtedly continue to in the future. However, it is not this Court's role to pass on the wisdom of Congress's choice. *See, e.g.*, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 197 (1824) ("The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections[] are . . . the sole restraints on which they have relied, to secure them from its abuse."). We consider only whether the Constitution grants Congress the power to enact this legislation.

The minimum coverage provision, like all congressional enactments, is entitled to a "presumption of constitutionality," and will be invalidated only upon a "plain showing that Congress has exceeded its constitutional bounds." *United States v. Morrison*, 529 U.S. 598, 607 (2000). The presumption that the minimum coverage provision is valid is "not a mere polite gesture. It is a deference due to deliberate judgment by constitutional majorities of the two Houses of Congress that an Act is within their delegated power . . . ." *United States v. Five Gambling Devices*, 346 U.S. 441, 449 (1953).

#### A. The Supreme Court's Commerce Clause Jurisprudence

In our dual system of government, the federal government is limited to its enumerated powers, while all other powers are reserved to the states or to the people. U.S. Const. amend. X. States have authority under their general police powers to enact minimum coverage provisions similar to the one in the Affordable Care Act. *See* Mass. Gen. Laws Ann. ch. 111M, § 2 (West 2011). However, the federal government has no police power and may enact such a law only if it is authorized by one of its enumerated

powers. *See, e.g.*, *United States v. Lopez*, 514 U.S. 549*, 566 (1995).  Our task is to review the district court's conclusion that Congress properly relied on its authority under the Commerce Clause to enact the minimum coverage provision.

Recognizing that uniform federal regulation is necessary in some instances, the Commerce Clause of the Constitution grants Congress the power "[t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. Art. I, § 8, cl. 3.  The Supreme Court has held that Congress has broad authority to regulate under the Commerce Clause.  From 1937 to 1994 it did not invalidate a single law as unconstitutional for exceeding the scope of Congress's Commerce Power.  The Court has explained that Congress's Commerce Clause power encompasses three broad spheres: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce, . . . *i.e.*, those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59.

Because the United States does not contend that the minimum coverage provision falls within either of the first two categories, we proceed to consider whether the provision falls within Congress's power to regulate activities that substantially affect interstate commerce.  Current Supreme Court jurisprudence reveals that Congress may use this category of its Commerce Power to regulate two related classes of activity.  First, it has long been established that Congress may regulate economic activity, even if wholly intrastate, if it substantially affects interstate commerce.  *See Gonzales v. Raich*, 545 U.S. 1, 25 (2005); *Morrison*, 529 U.S. at 610; *Lopez*, 514 U.S. at 560.

Second, Congress may also regulate even non-economic intrastate activity if doing so is essential to a larger scheme that regulates economic activity.  For example, in *Wickard v. Filburn*, 317 U.S. 111 (1942), the Court upheld regulations limiting the amount of wheat that farmers could grow, even for non-commercial purposes.  Even though producing and consuming home-grown wheat is non-economic intrastate activity, Congress rationally concluded that the failure to regulate this class of activities would

undercut its broader regulation of the interstate wheat market. *Id.* at 127-28. This is because individuals would be fulfilling their own demand for wheat rather than resorting to the market, which would thwart Congress's efforts to stabilize prices. *Id.* at 128-29. Similarly, in *Gonzales v. Raich*, the Court held that the federal Controlled Substances Act could be applied to prohibit the local cultivation and possession of marijuana authorized under California law. 545 U.S. at 19. Leaving home-grown and home-consumed marijuana outside federal control would undercut Congress's broader regulation of interstate economic activity. *Id.* Thus, *Wickard* and *Raich* establish that "Congress can regulate purely intrastate activity that is not itself 'commercial,' in that it is not produced for sale, if it concludes that failure to regulate that class of activity would undercut the regulation of the interstate market in that commodity." *Id.* at 18.

Despite the Supreme Court's broad interpretation of the Commerce Power, it has emphasized in two recent cases that this power is subject to real limits. In *United States v. Lopez* and *United States v. Morrison*, the Court struck down single-subject criminal statutes as beyond Congress's power under the Commerce Clause. The Supreme Court held that the statutes at issue in these cases, the Gun Free School Zones Act and the Violence Against Women Act, exceeded Congress's Commerce Clause power based on four main factors: (1) the statutes regulated non-economic, criminal activity and were not part of a larger regulation of economic activity; (2) the statutes contained no jurisdictional hook limiting their application to interstate commerce; (3) any Congressional findings regarding the effects of the regulated activity on interstate commerce were not sufficient to sustain constitutionality of the legislation; and (4) the link between the regulated activity and interstate commerce was too attenuated. *See Morrison*, 529 U.S. at 601-15; *Lopez*, 514 U.S. at 561-67. The Court found that accepting Congress's proffered reasons for the statutes would have paved the way for Congress to regulate those quintessentially local actions that the Constitution left within the purview of the states. *Morrison*, 529 U.S. at 615-16.

**B. Whether the Minimum Coverage Provision is a Valid Exercise of the Commerce Power under *Lopez*, *Morrison*, and *Raich***

In applying this jurisprudence, our first duty is to determine the class of activities that the minimum coverage provision regulates. *See, e.g.*, *Perez v. United States*, 402 U.S. 146, 153-54 (1971) (directing courts to determine first whether the class of activities regulated by a statute is within the reach of Congress's power). There is debate over whether the provision regulates activity in the market of health insurance or in the market of health care. In the most literal, narrow sense, the provision might be said to regulate conduct in the health insurance market by requiring individuals to maintain a minimum level of coverage. However, Congress's intent and the broader statutory scheme may help to illuminate the class of activities that a provision regulates. *See, e.g.*, *Swift & Co. v. United States*, 196 U.S. 375, 398 (1905) ("[C]ommerce among the states is not a technical legal conception, but a practical one, drawn from the course of business."); *United States v. Ambert*, 561 F.3d 1202, 1212 (11th Cir. 2009) ("Congress did not focus on individual local registration as an end in itself, but rather as part of its goal to create a system to track and regulate the movement of sex offenders from one jurisdiction to another."). The Act considered as a whole makes clear that Congress was concerned that individuals maintain minimum coverage not as an end in itself, but because of the economic implications on the broader health care market. Virtually everyone participates in the market for health care delivery, and they finance these services by either purchasing an insurance policy or by self-insuring. Through the practice of self-insuring, individuals make an assessment of their own risk and to what extent they must set aside funds or arrange their affairs to compensate for probable future health care needs.[3] Thus, set against the Act's broader statutory scheme, the minimum coverage provision reveals itself as a regulation on the activity of participating in the national market for health care delivery, and specifically the activity of self-insuring for the cost of these services.

---

[3]We use the term self-insurance for ease of discussion. We note, however, that it is actually a misnomer because no insurance is involved, and might be better described as risk retention.

Plaintiffs challenge the minimum coverage provision on its face as an unconstitutional exercise of congressional authority. They accept the class of activities that the provision purports to reach: participating in the national market for health care services without maintaining insurance that meets the minimum coverage requirement. Unlike the plaintiffs in *Raich*, they do not attempt to carve out a subset class of activities and to deny that their conduct has substantial effects on interstate commerce. Rather, like the plaintiffs in *Lopez* and *Morrison*, they claim that the entire class of activities that the provision attempts to reach is beyond Congress's power to regulate.[4] In this Circuit, "[f]acial invalidation of a statute . . . is reserved only for when there are no set of circumstances in which the statute's application would be constitutional." *United States v. Faasse*, 265 F.3d 475, 487 n.10 (6th Cir. 2001) (en banc); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987).

By regulating the practice of self-insuring for the cost of health care delivery, the minimum coverage provision is facially constitutional under the Commerce Clause for two independent reasons. First, the provision regulates economic activity that Congress had a rational basis to believe has substantial effects on interstate commerce. In addition, Congress had a rational basis to believe that the provision was essential to its larger economic scheme reforming the interstate markets in health care and health insurance.

## 1. The minimum coverage provision regulates economic activity with a substantial effect on interstate commerce

Congress may regulate economic activity, even if wholly intrastate, that substantially affects interstate commerce. *See Raich*, 545 U.S. at 25; *Morrison*, 529 U.S. at 610; *Lopez*, 514 U.S. at 560. Additionally, "[w]e need not determine whether [the]

---

[4]If a group of plaintiffs brought an as-applied challenge, in contrast, they would claim that their conduct does not have substantial effects on interstate commerce, either because they never access the health care market or because they are fully capable of paying for any health care services that they consume. We have no occasion to address these situations in detail but note only that if the minimum coverage provision is facially constitutional, then it is difficult to imagine a circumstance under which an as-applied Commerce Clause challenge to the provision would succeed. *See, e.g.*, *United States v. Maxwell*, 446 F.3d 1210, 1215 n.5 (11th Cir. 2006) ("[*Raich*] leaves some doubt as to whether, in the Commerce Clause context, an as-applied challenge may ever be sustained so long as Congress may constitutionally regulate the broader class of activities of which the intrastate activity is a part . . . .").

activities, taken in the aggregate, substantially affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Raich*, 545 U.S. at 22 (citing *Lopez*, 514 U.S. at 557). Thus, our task is to determine whether self-insuring for the cost of health care services is an economic activity, and whether Congress had a rational basis to conclude that, in the aggregate, this activity substantially affects interstate commerce.

The minimum coverage provision regulates activity that is decidedly economic. In *Raich*, the Supreme Court explained that "'[e]conomics' refers to 'the production, distribution, and consumption of commodities.'" *Id.* at 25 (quoting Webster's Third New International Dictionary 720 (1966)). Consumption of health care falls squarely within *Raich*'s definition of economics, and virtually every individual in this country consumes these services. Individuals must finance the cost of health care by purchasing an insurance policy or by self-insuring, cognizant of the backstop of free services required by law. By requiring individuals to maintain a certain level of coverage, the minimum coverage provision regulates the financing of health care services, and specifically the practice of self-insuring for the cost of care. The activity of foregoing health insurance and attempting to cover the cost of health care needs by self-insuring is no less economic than the activity of purchasing an insurance plan. Thus, the financing of health care services, and specifically the practice of self-insuring, is economic activity.

Furthermore, Congress had a rational basis to believe that the practice of self-insuring for the cost of health care, in the aggregate, substantially affects interstate commerce. An estimated 18.8% of the non-elderly United States population (about 50 million people) had no form of health insurance for 2009. U.S. Census Bureau, Income, Poverty, and Health Insurance Coverage in the United States: 2009, at 23, table 8 (2010). Virtually everyone requires health care services at some point, and unlike nearly all other industries, the health care market is governed by federal and state laws requiring institutions to provide services regardless of a patient's ability to pay. The uninsured cannot avoid the need for health care, and they consume over $100 billion in health care

services annually. Families USA, Hidden Health Tax: Americans Pay a Premium, at 2 (2009). The high cost of health care means that those who self-insure, as a class, are unable to pay for the health care services that they receive. Congress found that the aggregate cost of providing uncompensated care to the uninsured in 2008 was $43 billion. 42 U.S.C. § 18091(a)(2)(F). Congress also determined that the cost of uncompensated care is passed on from providers "to private insurers, which pass on the cost to families." *Id.* This cost-shifting inflates the premiums that families must pay for their health insurance "by on average over $1,000 a year." *Id.* Rising premiums push even more individuals out of the health insurance market, further increasing the cost of health insurance and perpetuating the cycle. *See 47 Million and Counting: Why the Health Care Marketplace Is Broken: Hearing Before the S. Comm. on Finance*, 110th Cong. 49 (2008) (Statement of Mark A. Hall). Thus, the practice of self-insuring substantially affects interstate commerce by driving up the cost of health care as well as by shifting costs to third parties.

Self-insuring for the cost of health care directly affects the interstate market for health care delivery and health insurance. These effects are not at all attenuated as were the links between the regulated activities and interstate commerce in *Lopez* and *Morrison*. Similar to the causal relationship in *Wickard*, self-insuring individuals are attempting to fulfill their own demand for a commodity rather than resort to the market and are thereby thwarting Congress's efforts to stabilize prices. Therefore, the minimum coverage provision is a valid exercise of the Commerce Power because Congress had a rational basis for concluding that, in the aggregate, the practice of self-insuring for the cost of health care substantially affects interstate commerce.

**2. The minimum coverage provision is an essential part of a broader economic regulatory scheme**

Alternatively, even if self-insuring for the cost of health care were not economic activity with a substantial effect on interstate commerce, Congress could still properly regulate the practice because the failure to do so would undercut its regulation of the larger interstate markets in health care delivery and health insurance. In *Raich*, the Supreme Court explained that Congress can regulate non-commercial intrastate activity

if it concludes that it is necessary in order to regulate a larger interstate market. 545 U.S. at 18. The Court found relevant that unlike the single-subject criminal statutes at issue in *Morrison* and *Lopez*, the classification of marijuana at issue in *Raich* was "merely one of many 'essential part[s] of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.'" *Id.* at 24-25 (alteration in original) (quoting *Lopez*, 514 U.S. at 561). The *Raich* Court highlighted two aspects of Congress's broad power under the Commerce Clause. First, Congress may aggregate the effects of non-commercial activity and assess the overall effect on the interstate market. *Id.* at 22. Second, the rational basis test applies to Congress's judgment that regulating intrastate non-economic activity is essential to its broader regulatory scheme. *Id.* at 19. Thus, where Congress comprehensively regulates interstate economic activity, it may regulate non-economic intrastate activity if it rationally believes that, in the aggregate, the failure to do so would undermine the effectiveness of the overlying regulatory scheme.[5]

We have applied this doctrine to uphold laws prohibiting intrastate possession of child pornography and intrastate transfer of firearms that are part of broader economic regulatory schemes. *See, e.g.*, *Bowers*, 594 F.3d at 529 ("*Raich* indicates that Congress has the ability to regulate wholly intrastate manufacture and possession of child pornography, regardless of whether it was made or possessed for commercial purposes, that it rationally believes, if left unregulated in the aggregate, could work to undermine Congress's ability to regulate the larger interstate commercial activity."); *United States v. Rose*, 522 F.3d 710, 719 (6th Cir. 2008) ("Congress had a rational basis for concluding that the intrastate transfer of firearms would undercut its regulation of the interstate firearms market . . . ."). In addition, our sister circuits have applied this rationale in upholding laws requiring sex offender registration. *See, e.g.*, *United States v. Gould*, 568 F.3d 459, 475 (4th Cir. 2009) ("Requiring *all* sex offenders to register is an integral part

---

[5]The Supreme Court has applied this larger regulatory scheme doctrine only in *Raich*, which addressed an as-applied challenge, while this case involves a facial challenge. However, because the larger regulatory scheme doctrine was articulated in *Lopez*, which addressed a facial challenge, it applies to facial challenges as well. *See Lopez*, 514 U.S. at 561 ("[The Gun-Free School Zones Act] is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.").

of Congress' regulatory effort and the regulatory scheme could be undercut unless the intrastate activity were regulated." (internal quotation marks and citation omitted)); *Ambert*, 561 F.3d at 1211; *United States v. Howell*, 552 F.3d 709, 717 (8th Cir. 2009). Similarly, Congress had a rational basis to conclude that failing to regulate those who self-insure would undermine its regulation of the interstate markets in health care delivery and health insurance.

As plaintiffs concede, Congress has the power under the Commerce Clause to regulate the interstate markets in health care delivery and health insurance. It has long been settled that "Congress plainly has power to regulate the price of [products] distributed through the medium of interstate commerce . . . [and] it possesses every power needed to make that regulation effective." *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 118-19 (1942); *see United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 552-53 (1944). In doing so, Congress may decide "to give protection to sellers or purchasers or both." *Currin v. Wallace*, 306 U.S. 1, 11 (1939). The Act uses this power to regulate prices and protect purchasers by banning certain practices in the insurance industry that have prevented individuals from obtaining and maintaining insurance coverage. Under the process of "medical underwriting," insurance companies review each applicant's medical history and health status to determine eligibility and premium levels. As a result of this practice, approximately thirty-six percent of applicants in the market for individual health insurance are denied coverage, charged a substantially higher premium, or offered only limited coverage that excludes pre-existing conditions. Department of Health and Human Services, Coverage Denied: How the Current Health Insurance System Leaves Millions Behind, at 1 (2009). The Act bans this practice through a guaranteed issue requirement, which bars insurance companies from denying coverage to individuals with pre-existing conditions; and a community rating requirement, which prohibits insurance companies from charging higher rates to individuals based on their medical history. 42 U.S.C. §§ 300gg, 300gg-1(a), 300gg-3(a). No one denies that Congress properly enacted these reforms as part of its power to regulate the interstate markets in health care delivery and health insurance.

Furthermore, Congress had a rational basis for concluding that leaving those individuals who self-insure for the cost of health care outside federal control would undercut its overlying economic regulatory scheme. Congress found that without the minimum coverage provision, the guaranteed issue and community rating provisions would increase existing incentives for individuals to delay purchasing health insurance until they need care. *Id.* § 18091(a)(2)(I). The legislative record demonstrated that the seven states that had enacted guaranteed issue reforms without minimum coverage provisions suffered detrimental effects to their insurance markets, such as escalating costs and insurance companies exiting the market. In contrast, Congress found that "[i]n Massachusetts, a [minimum coverage] requirement has strengthened private employer-based coverage: despite the economic downturn, the number of workers offered employer-based coverage has actually increased." *Id.* § 18091(a)(2)(D). It was reasonable for Congress to conclude that failing to regulate those who self-insure would "leave a gaping hole" in the Act. *Cf. Raich*, 545 U.S. at 22 (holding that Congress had a rational basis to conclude that failing to regulate intrastate manufacture and possession of marijuana would "leave a gaping hole" in the Controlled Substances Act). Congress rationally found that the minimum coverage provision "is essential to creating effective health insurance markets in which improved health insurance products that are guaranteed issue and do not exclude coverage of pre-existing conditions can be sold." 42 U.S.C. § 18091(a)(2)(I). Congress had a rational basis for concluding that the minimum coverage requirement is essential to its broader reforms to the national markets in health care delivery and health insurance. Therefore, the minimum coverage provision is a valid exercise of the Commerce Clause power.

## C. Whether the Minimum Coverage Provision Impermissibly Regulates Inactivity

Thomas More argues that the minimum coverage provision exceeds Congress's power under the Commerce Clause because it regulates inactivity. However, the text of the Commerce Clause does not acknowledge a constitutional distinction between activity and inactivity, and neither does the Supreme Court. Furthermore, far from regulating inactivity, the provision regulates active participation in the health care market.

As long as Congress does not exceed the established limits of its Commerce Power, there is no constitutional impediment to enacting legislation that could be characterized as regulating inactivity. The Supreme Court has never directly addressed whether Congress may use its Commerce Clause power to regulate inactivity, and it has not defined activity or inactivity in this context. However, it has eschewed defining the scope of the Commerce Power by reference to flexible labels, and it consistently stresses that Congress's authority to legislate under this grant of power is informed by "broad principles of economic practicality." *Lopez*, 514 U.S. at 571 (Kennedy, J., concurring); *see Wickard*, 317 U.S. at 120 (explaining that Congress's power cannot be determined "by reference to any formula which would give controlling force to nomenclature such as 'production' and 'indirect' and foreclose consideration of the actual effects of the activity in question upon interstate commerce").

Similarly, this Court has also refused to focus on imprecise labels when determining whether a statute falls within Congress's Commerce Power. For example, we rejected the argument that the Child Support Recovery Act is unconstitutional because it regulates an individual's failure to place an item in commerce. Instead, we held that Congress had a rational basis for concluding that a non-custodial spouse's failure to send court-ordered child support payments across state lines substantially affects interstate commerce. *Faasse*, 265 F.3d at 490-91; *accord United States v. Black*, 125 F.3d 454, 462 (7th Cir. 1997); *United States v. Parker*, 108 F.3d 28, 30 (3d Cir. 1997); *United States v. Hampshire*, 95 F.3d 999, 1004 (10th Cir. 1996). Focusing on the broader economic landscape of the legislation revealed the unworkability of relying on inexact labels because there was "no principled distinction between the parent who fails to send any child support through commerce and the parent who sends only a fraction of the amount owed." *Faasse*, 265 F.3d at 487 n.9. Here, too, the constitutionality of the minimum coverage provision cannot be resolved with a myopic focus on a malleable label. Congress had a rational basis for concluding that the practice of self-insuring for the cost of health care has a substantial effect on interstate commerce, and that the minimum coverage provision is an essential part of a broader economic regulatory

scheme. Thus, the provision is constitutional notwithstanding the fact that it could be labeled as regulating inactivity.

Furthermore, far from regulating inactivity, the minimum coverage provision regulates individuals who are, in the aggregate, active in the health care market. The Supreme Court has stated that "when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented [Congress] may do so." *Westfall v. United States*, 274 U.S. 256, 259 (1927). The vast majority of individuals are active in the market for health care delivery because of two unique characteristics of this market: (1) virtually everyone requires health care services at some unpredictable point; and (2) individuals receive health care services regardless of ability to pay.

Virtually everyone will need health care services at some point, including, in the aggregate, those without health insurance. Even dramatic attempts to protect one's health and minimize the need for health care will not always be successful, and the health care market is characterized by unpredictable and unavoidable needs for care. The ubiquity and unpredictability of the need for medical care is born out by the statistics. More than eighty percent of adults nationwide visited a doctor or other health care professional one or more times in 2009. Centers for Disease Control and Prevention National Center for Health Statistics, Summary Health Statistics for U.S. Adults: National Health Interview Survey, 2009, table 35 (2010). Additionally, individuals receive health care services regardless of whether they can afford the treatment. The obligation to provide treatment regardless of ability to pay is imposed by the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd, state laws, and many institutions' charitable missions. The unavoidable need for health care coupled with the obligation to provide treatment make it virtually certain that all individuals will require and receive health care at some point. Thus, although there is no firm, constitutional bar that prohibits Congress from placing regulations on what could be described as inactivity, even if there were it would not impact this case due to the unique aspects of health care that make all individuals active in this market.

## IV.  IS THE MINIMUM COVERAGE PROVISION A CONSTITUTIONAL EXERCISE OF CONGRESS'S TAXING POWER?

In light of the conclusion that the minimum coverage provision is a valid exercise of Congress's power under the Commerce Clause, it is not necessary to resolve whether the provision could also be sustained as a proper exercise of Congress's power to tax and spend under the General Welfare Clause, U.S. Const. Art. I, § 8, cl. 1.

## V.  CONCLUSION

Congress had a rational basis for concluding that, in the aggregate, the practice of self-insuring for the cost of health care substantially affects interstate commerce. Furthermore, Congress had a rational basis for concluding that the minimum coverage provision is essential to the Affordable Care Act's larger reforms to the national markets in health care delivery and health insurance.  Finally, the provision regulates active participation in the health care market, and in any case, the Constitution imposes no categorical bar on regulating inactivity.  Thus, the minimum coverage provision is a valid exercise of Congress's authority under the Commerce Clause, and the decision of the district court is **AFFIRMED**.

---

**CONCURRING IN PART AND
DELIVERING THE OPINION OF THE COURT IN PART**

---

SUTTON, Circuit Judge.  The National Government is "one of enumerated" and limited "powers," a feature of the United States Constitution "universally admitted" in 1819, *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 405, and still largely accepted today.  "But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist." *Id.*

So it has.  Section 1501 of the Patient Protection and Affordable Care Act of 2010 requires most Americans to buy a minimum level of medical insurance and, if they do not, to pay a monetary penalty instead.  Today's "question" about the "extent of the powers" granted to Congress goes primarily to its commerce power to compel individuals to buy something they do not want (medical insurance) as part of a regulatory system that a majority of elected representatives do want (national health care).

*The claimants' case*.  As the claimants see it, Congress's authority to "regulate" interstate "commerce" extends only to individuals already in the stream of the relevant commercial market, in this instance health insurance.  It no more permits Congress to conscript an individual to enter that market on the buy side than it permits Congress to require a company that manufactures cars to peddle health insurance on the sell side.  Not only the words of the Commerce Clause undercut the validity of the individual mandate, so too does custom.  Congress has never exercised its commerce power in this way, and nothing suggests that this tradition reflects 220 years of self-restraint.  If the commerce power permits Congress to force individuals to enter whatever markets it chooses, any remaining hold on national power will evaporate, leaving future limits to the whims of legislative restraint, the epitome of a system *without* restrictions, balance or any other constraints on power.  If Congress does not have a "blank check" in passing war-on-terror legislation, *Hamdi v. Rumsfeld*, 542 U.S. 507, 536 (2004) (plurality

opinion), it should not have a blank check in passing healthcare legislation. Even if the commerce power has "evolved over time" in favor of greater congressional power, *Gonzales v. Raich*, 545 U.S. 1, 15–16 (2005), that need not invariably be the case, lest each expansion of federal power beget another, piling one inference of an unlimited national police power onto another.

*The federal government's case.* The issue is not that simple, the government responds. What has principally changed over the last two centuries is commerce. As means of travel and communication have advanced, any meaningful distinction between local and national commerce has essentially disappeared, and the Court's tolerance of congressional regulation of local activity reflects this modern reality as much as it reflects a changeable conception of the commerce power. The minimum-essential-coverage mandate fits within the Supreme Court's commerce clause jurisprudence. Even accepting the claimants' characterization of the law as regulating "non-activity," the law still concerns individual decisions that, when aggregated, have a substantial effect on interstate commerce. Individuals cannot disclaim the need to obtain health care and to pay for it, as virtually everyone at some point will consume healthcare services. In this sense, it is hard to characterize self-insurance as non-action, as opposed to one of many possible actions an individual may take in determining how to pay for health care. Whether looked at as a mechanism for providing affordable medical care for all or an unprecedented act of national paternalism, both characterizations of the individual mandate go to a policy debate that the American people and their representatives have had, and will continue to have, over the appropriate role of the national government in our lives, the merits of which do not by themselves provide a cognizable basis for invalidating the law.

## I.

Before refereeing this complex debate, it is worth asking whether there is another way to resolve it—whether the insurance mandate can be sustained under a different source of authority: Congress's power "To lay and collect Taxes . . . to . . . provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Would that

it were so. That would simplify our task, as it is easy to envision a system of national health care, including one with a minimum-essential-coverage provision, permissibly premised on the taxing power. Congress might have raised taxes on everyone in an amount equivalent to the current penalty, then offered credits to those with minimum essential insurance. Or it might have imposed a lower tax rate on people with health insurance than those without it. But Congress did neither of these things, and that makes a difference.

Under the taxing power, a "'tax' is an enforced contribution to provide for the support of government." *United States v. La Franca*, 282 U.S. 563, 572 (1930). The central objective of a tax is to "obtain[] revenue." *Child Labor Tax Case*, 259 U.S. 20, 38 (1922). A "penalty," by contrast, regulates conduct by establishing "criteria of wrongdoing and imposing its principal consequence on those who transgress its standard." *Id*. In placing a law on one side or the other of this divide, courts consider "the intent and meaning of the legislature" based on "the language of the act." *A. Magnano Co. v. Hamilton*, 292 U.S. 40, 46 (1934).

The individual mandate is a regulatory penalty, not a revenue-raising tax, for several reasons. *First*, that is what Congress said. It called the sanction for failing to obtain medical insurance a "penalty," not a tax. Words matter, and it is fair to assume that Congress knows the difference between a tax and a penalty, between its taxing and commerce powers, making it appropriate to take Congress at its word. That is all the more true in an era when elected officials are not known for casually discussing, much less casually increasing, taxes. When was the last time a candidate for elective office promised not to raise "penalties"?

*Second*, the legislative findings in the Act show that Congress invoked its commerce power, not its taxing authority. "The individual responsibility requirement," Congress explained, "is commercial and economic in nature, and substantially affects interstate commerce . . . . " 42 U.S.C. § 18091(a)(1). Other findings come to the same end. *See id.* § 18091(a)(2)(A) ("The requirement regulates activity that is commercial and economic in nature: economic and financial decisions about how and when health

care is paid for, and when health insurance is purchased."); § 18091(a)(2)(B) ("Health insurance and health care services are a significant part of the national economy."); § 18091(a)(3) ("In *United States v. South-Eastern Underwriters Ass'n* (322 U.S. 533 (1944)), the Supreme Court of the United States ruled that insurance is interstate commerce subject to Federal regulation."). The findings say nothing about, or even suggestive of, the taxing power.

*Third*, Congress showed throughout the Act that it understood the difference between these terms and concepts, using "tax" in some places and "penalty" in others. The statute not only says that the consequence of failing to obtain healthcare coverage leads to a "penalty," but it also proceeds to use the word at least 17 other times in the individual mandate provision, *see* 26 U.S.C. § 5000A, and by our rough count 180 or so times in the rest of the Act. In other parts of the law, Congress imposed "taxes," using that word 620 or so times. Congress respected the distinction between the words throughout the Act, and so should we. *See Russello v. United States*, 464 U.S. 16, 23 (1983).

*Fourth*, the central function of the mandate was *not* to raise revenue. It was to change individual behavior by requiring all qualified Americans to obtain medical insurance. As Congress explained in its findings, a key objective of the Act is to broaden the health-insurance risk pool by requiring more Americans to participate in it before, not after, they need medical care. *See, e.g.*, 42 U.S.C. § 18091(a)(2)(I). That is why the Act generally requires uninsured individuals to buy *private* insurance, a requirement that will not raise *any* revenue for the government. And that is why the penalty is capped at an amount pegged to the price of *private* health insurance. *See* 26 U.S.C. § 5000A(c)(1). The penalty provision, to be sure, will raise revenue. But it strains credulity to say that the proponents of the Act will call it a success if the individuals affected by the mandate simply pay penalties rather than buy private insurance.

Other legislative findings bear this out. They say nothing about raising revenue, the central objective of imposing taxes. They instead focus on the law's regulatory

motive—to "achieve[] near-universal coverage" by adding "millions of new consumers to the health insurance market."  42 U.S.C. § 18091(a)(2)(C).  While describing the requirement as "commercial and economic in nature, and substantially affect[ing] commerce," there is no mention of a desire to "provide for the support of government," *La Franca*, 282 U.S. at 572.  The Act, indeed, seeks to do the opposite:  to encourage everyone to carry health insurance, leaving no one subject to the penalty (and no revenue to boot).

*Fifth*, case law supports this conclusion.  The Act operates by starting with a substantive provision that "adopt[s] the criteria of wrongdoing," *Child Labor Tax Case*, 259 U.S. at 20, which states that every "applicable individual shall" have health insurance.  26 U.S.C. § 5000A(a).  The Act then spells out the "principal consequence on those who transgress its standard," *Child Labor Tax Case*, 259 U.S. at 38, which is to impose a penalty on an individual who "fails to meet the requirement of" § 5000A(a), giving the minimum-coverage mandate the "characteristics of regulation and punishment," *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 779 (1994), not taxation.

The government offers several contrary arguments, all unconvincing.  That the minimum-coverage requirement will raise revenue when individuals fail to obtain coverage—at a rate of $4 billion a year, predicts the government, U.S. Br. at 59–60—does not convert the penalty into a tax.  Otherwise, every monetary penalty, no matter how regulatory or punitive, would be a tax.  *Cf. Kurth Ranch*, 511 U.S. at 778 ("Criminal fines, civil penalties, civil forfeitures, and taxes all . . . generate government revenues, impose fiscal burdens on individuals, and deter certain behavior.").

That Congress placed responsibility for enforcing the penalty with the IRS does not make the minimum-coverage provision a tax.  The IRS enforces other regulatory penalties, *see, e.g.*, 26 U.S.C. § 9707 (penalty for mining operators who fail to pay retirement health benefit premiums); § 5761(c) (penalty for domestic sales of tobacco labeled for export); § 527(j) (penalty for failure to make required election-related disclosures), yet that does not transform them all into taxes.  Congress, at any rate, had practical reasons for housing enforcement of the mandate in the IRS.  The IRS already

has an enforcement regime in place, under which individuals must file returns once a year, creating a ready-made vehicle for annual reports about whether they have purchased the requisite insurance. Whenever Congress creates a new penalty, it need not create a new federal agency to enforce it.

Even then, the Act does not treat the mandate like a tax, as it prohibits the IRS from using its most salient enforcement tools in collecting the penalty. The IRS may not place a lien on the property of an individual who does not comply with the mandate and does not pay a penalty. *See id.* § 5000A(g)(2)(B). Not so for individuals who fail to pay their taxes. *See id.* § 6321. The IRS may not use its "levy" authority, prohibiting it from garnishing wages or seizing property from individuals who fail to obtain insurance. *See id.* § 5000A(g)(2)(B). Not so for individuals who fail to pay their taxes. *See id.* § 6331. And the IRS may not initiate a criminal prosecution against individuals who fail to buy insurance. *See id.* § 5000A(g)(2)(A). Not so for individuals who fail to pay their taxes. *See id.* § 7201. As it turns out, all the IRS may do to enforce the penalty is set off unpaid penalties against an individual's refund (if there is one) or launch a civil action against the individual. *See id.* §§ 6402(a), 6502(a), 7401 *et seq.* The government does not traditionally collect taxes in this way.

That Congress has a "comprehensive" and "plenary" power to tax, U.S. Br. at 58, shows that, *if* the legislature had used taxes in this part of the Affordable Care Act, the Act likely would be constitutional. But that does not tell us whether Congress invoked this power or whether the penalty is a "Tax[]" under Article I of the Constitution. It did not, and it is not.

That the constitutionality of a law "does not depend on recitals of the power which it undertakes to exercise," *Woods v. Cloyd W. Miller Co.*, 333 U.S. 138, 144 (1948), changes nothing. In enumerated-power cases, there often will be a question whether Congress invoked its powers under the Commerce Clause, § 5 of the Fourteenth Amendment, the Spending Clause or the Taxing Clause, and *Woods* establishes that congressional recitals provide sufficient grounds for invoking a power but not the exclusive means for doing so. None of this alters the reality that each power has distinct

substantive predicates and distinct substantive terms, and the courts may not simply label a law something it is not.

That the penalty in its "practical operation," U.S. Br. at 58, shares traits of a tax and that the opposite is sometimes true—taxes occasionally resemble regulatory penalties—do not change things either. From an economic standpoint, the line between regulatory penalties and taxes may sometimes blur: Taxes and penalties both extract money from individuals; both shape behavior as a result; and every tax penalizes people by imposing an "economic impediment" on one person "as compared with others not taxed." *Sonzinsky v. United States*, 400 U.S. 506, 513 (1937). Many penalties, indeed, might have been enacted in the form and substance of taxes, as indeed could have been the case here. But none of this makes a penalty a "Tax[]" under Article I in a given case, and it does not make it so here.

Pressing the point, the government goes one step further. It submits that there no longer is a tenable distinction between Congress's taxing and commerce powers in this setting, invoking the Supreme Court's statement that it has "abandoned" the "distinction[] between regulatory and revenue-raising taxes." *Bob Jones Univ. v. Simon*, 416 U.S. 725, 741 n.12 (1974). But it is premature, and assuredly not the job of a middle-management judge, to abandon the distinction between taxes and penalties. The language from *Bob Jones* is the purest of *dicta*, as the case involved the Anti-Injunction Act, not the taxing power, and was not even necessary to the statutory holding. The taxing-power cases, it is true, are old. Yet cases of a certain age are just as likely to rest on venerable principles as stale ones, particularly when there is a good explanation for their vintage. All of these decisions, as it turns out, pre-date the Court's expansion of the commerce power, which largely "rendered moot" the need to worry about the tax/penalty distinction. Laurence H. Tribe, 1 American Constitutional Law 846. Nonetheless, the line between "revenue production and mere regulation," described by Chief Justice Taft in the *Child Labor Tax Case*, 259 U.S. at 38, retains force today. Look no further than *Kurth Ranch*, a 1994 decision that post-dated *Bob Jones* and that relied on the *Child Labor Tax Case* to hold that what Congress had labeled a tax

amounted to an unconstitutional penalty under the Double Jeopardy Clause.  *See* 511 U.S. at 779–83.

Before giving this distinction a premature burial, moreover, it is worth remembering that it parallels other constitutional inquiries.  Courts must distinguish taxes from fees when construing the Export Clause, *see United States v. U.S. Shoe Corp.*, 523 U.S. 360, 367–70 (1998), the States' implied immunity from federal taxation, *see Massachusetts v. United States*, 435 U.S. 444, 462 (1978), and the National Government's immunity from state taxation, *see United States v. City of Huntington*, 999 F.2d 71, 73 (4th Cir. 1993).  The inquiry also is a kissing cousin of statutory questions frequently raised about the tax/penalty and tax/fee distinctions under the Anti-Injunction Act, *see Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1362 & n.5 (11th Cir. 2003), the Tax Injunction Act, *see San Juan Cellular Tel. v. Pub. Serv. Comm'n*, 967 F.2d 683, 685 (1st Cir. 1992) (Breyer, J.), and the Bankruptcy Act, *see United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 226 (1996).

That the constitutional-avoidance doctrine permits courts to construe statutes to sidestep difficult constitutional questions also makes no difference.  The doctrine does not allow a court to avoid a difficult constitutional question by diluting the meaning of another constitutional provision—the meaning of "Taxes" under Article I.  It allows courts only to choose between a decision with a constitutional ruling and one without a constitutional ruling, *see Clark v. Martinez*, 543 U.S. 371, 381 (2005), not between two constitutional questions of varying degrees of difficulty.  At the end of the day, this penalty is not a "Tax[]" under Article I of the Constitution, and Congress's taxing power thus cannot sustain it.

## II.

### A.

The Constitution empowers Congress "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."  U.S. Const. art. I, § 8, cl. 3.  And it permits Congress "[t]o make all Laws which shall be necessary and

proper for carrying into Execution" the commerce power.  U.S. Const. art. I, § 8, cl. 18. Taken together, these grants of power permit Congress to regulate (1) the channels of interstate commerce (*e.g.*, rivers and roads), (2) the instrumentalities of interstate commerce (*e.g.*, ships and cars) as well as persons or things in it, and (3) those other economic activities, even wholly intrastate activities, that "substantially affect" interstate commerce.  *United States v. Lopez*, 514 U.S. 549, 558–59 (1995).

A short history of decisions in this area shows that the Court has given Congress wide berth in regulating commerce, frequently adopting limits on that authority and just as frequently abandoning them, all while continuing to deny that Congress has unlimited national police powers.

> *Congress may create a national bank.*  In 1819, the Court held that, even though no enumerated power authorized Congress to create a national bank, the Necessary and Proper Clause gave Congress "incidental [and] implied powers" to do so.  *McCulloch*, 17 U.S. at 406, 421.  Still, "[w]e admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended."  *Id.* at 421.

> *Congress may regulate intrastate activities—relations between workers and employers—that have a substantial relation to interstate commerce.* In 1937, the Court held that Congress could regulate intrastate employment activities that had "a close and substantial relation to interstate commerce."  *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 37.  Still, the commerce power does not "embrace effects . . . so indirect and remote that to embrace them . . . would effectually obliterate the distinction between what is national and what is local and create a completely centralized government."  *Id*.

> *Congress may regulate activities—growing wheat for on-the-farm consumption—that do not involve the production, manufacture or mining of products and materials and that have only indirect effects on interstate commerce.*  In 1942, the Court abandoned any distinction between activities that had "direct" and "indirect" effects on interstate commerce and between "commerce," which Congress could regulate, and "commercial activities" such as production, manufacturing and mining, which it could not.  *Wickard v. Filburn*, 317 U.S. 111, 119–20, 124. Still, the Court did not deny that "[t]he subject of federal power is . . . 'commerce' and not all commerce but commerce . . . among the several states."  *Santa Cruz Fruit Packing Co. v. NLRB*, 303 U.S. 453, 466 (1938).

*Congress may not regulate non-economic activities—possession of firearms in school zones and gender-motivated violence.* In 1995 and in 2000, the Court held that Congress may not "regulate noneconomic . . . conduct based solely on that conduct's aggregate effect on interstate commerce." *United States v. Morrison*, 529 U.S. 598, 617 (2000); *see also Lopez*, 514 U.S. at 567. But the force of these decisions remains unclear in view of two subsequent developments. First, soon after *Lopez*, Congress modified the Gun-Free School Zones Act, 18 U.S.C. § 922(q), to proscribe "knowingly . . . possess[ing] a firearm that has moved in or that otherwise affects interstate . . . commerce . . . [in] a school zone." *See* Pub. L. No. 104-208, § 657, 110 Stat. 3009, 3009-370 (1996) (codified at 18 U.S.C. § 922(q)(2)(A)). All of the courts of appeals to consider the question have upheld the amended statute against commerce clause challenges. *See, e.g.*, *United States v. Dorsey*, 418 F.3d 1038, 1046 (9th Cir. 2005); *United States v. Danks*, 221 F.3d 1037, 1039 (8th Cir. 1999) (per curiam). Second, in 2005, the Court held that Congress could regulate home-grown and home-consumed marijuana, even when state law prohibited it from entering any markets. *Raich*, 545 U.S. at 28–29.

This abridged history captures the difficulty of the task at hand. At one level, past is precedent, and one tilts at hopeless causes in proposing new categorical limits on the commerce power. But there is another way to look at these precedents—that the Court either should stop saying that a meaningful limit on Congress's commerce powers exists or prove that it is so. The stakes of identifying such a limit are high because the congressional power to regulate is the power to preempt, a power not just to regulate a subject co-extensively with the States but also to wipe out any contrary state laws on the subject. U.S. Const. art. VI, cl. 2. The plaintiffs present a plausible limiting principle, claiming that a mandate to buy medical insurance crosses a line between regulating action and inaction, between regulating those who have entered a market and those who have not, one that the Court and Congress have never crossed before.

B.

In my opinion, the government has the better of the arguments. Mindful that we at the court of appeals are not just fallible but utterly non-final in this case, let me start by explaining why existing precedents support the government.

1.

The nature of this challenge—a pre-enforcement facial attack on the individual mandate in all of its settings, as opposed to just some of them—favors the government. In most constitutional cases, the claimant challenges the constitutionality of a statute "as applied" to specific parties and circumstances. That is "the preferred route" for litigation because it confines judicial review to a "discrete factual setting." *Warshak v. United States*, 532 F.3d 521, 529–30 (6th Cir. 2008) (en banc); *see Gonzales v. Carhart*, 550 U.S 124, 168 (2007).

Facial challenges, by contrast, seek "to leave nothing standing"—to prevent any application of the law no matter the setting, "no matter the circumstances." *Warshak*, 532 F.3d at 528. They are "disfavored" because: (1) "they raise the risk of premature interpretation of statutes on the basis of factually barebones records," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008); (2) they undermine "the fundamental principle of judicial restraint," which counsels that "courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied," *id.*; and (3) they run the risk of "a judicial trespass," in which the court strikes down a law "in all of its applications even though the legislature has the prerogative and presumed objective to regulate some of them," *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009) (en banc). For these reasons, a facial attack is "the most difficult challenge to mount successfully," requiring the plaintiff to establish "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The judicial-constraint values underlying this doctrine apply equally to enumerated-power cases (like this one) and individual-liberty cases (like *Salerno*). The Court has said as much, noting that this "demanding standard" governs challenges to Congress's exercise of enumerated powers under Article I, § 8. *Sabri v. United States*, 541 U.S. 600, 604–05, 608–09 (2004). None of this means that the distinction makes a difference in every case or with respect to every argument. Some theories of invalidity

necessarily apply to all applications of a law. Others do not. This case, as shown at various points below, falls in the latter category, as some of plaintiffs' theories of invalidity—particularly their proposed action/inaction limitation on congressional power—do not cover many applications of the mandate.

2.

On the merits, this case presents two distinct questions: Does the individual mandate survive the substantial-effects test? And, if so, is there something about the novelty of this law—compelling the purchase of health insurance—that warrants striking it down nonetheless?

The initial question is the easier of the two, as the breadth of the substantial-effects doctrine and the nature of modern health care favor the validity of this law. No matter how you slice the relevant market—as obtaining health care, as paying for health care, as insuring for health care—all of these activities affect interstate commerce, in a substantial way. Start with obtaining medical care. Few people escape the need to obtain health care at some point in their lives, and most need it regularly. That explains why health-related spending amounted to 17.6% of the national economy, or $2.5 trillion, in 2009. 42 U.S.C. § 18091(a)(2)(B). Virtually all of this market affects interstate commerce, and many aspects of it—medical supplies, drugs and equipment—are directly linked to interstate commerce. *Id.*

What then of paying for health care or insuring to pay for it? These are two sides of the same coin. Life is filled with risks, and one of them is not having the money to pay for food, shelter, transportation and health care when you need it. Unlike most of these expenses, however, the costs of health care can vary substantially from year to year. The individual can count on incurring some healthcare costs each year (*e.g.*, an annual check-up, insulin for a diabetic) but cannot predict others (*e.g.*, a cancer diagnosis, a serious accident). That is why most Americans manage the risk of not having the assets to pay for health care by purchasing medical insurance. *See id.* § 18091(a)(2)(D). The medical insurance market is large, *id.* § 18091(a)(2)(D), (J), and

is inextricably linked to interstate commerce, *see id.* § 18091(a)(2)(B); *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533, 541 (1944).

The rub is the other method of paying for medical care: self-insurance. There are two ways to self-insure, and both, when aggregated, substantially affect interstate commerce. One option is to save money so that it is there when the need for health care arises. The other is to save nothing and to rely on something else—good fortune or the good graces of others—when the need arises. Congress found that providing uncompensated medical care to the uninsured cost $43 billion in 2008 and that these costs were shifted to others through higher premiums. *See* 42 U.S.C. § 18091(a)(2)(F). Based on these findings, Congress could reasonably conclude that the decisions and actions of the self-insured substantially affect interstate commerce.

In choosing *how* to regulate this group, Congress also did not exceed its power. The basic policy idea, for better or worse (and courts must assume better), is to compel individuals with the requisite income to pay now rather than later for health care. Faced with $43 billion in uncompensated care, Congress reasonably could require *all* covered individuals to pay for health care now so that money would be available later to pay for *all* care as the need arises. Call this mandate what you will—an affront to individual autonomy or an imperative of national health care—it meets the requirement of regulating activities that substantially affect interstate commerce.

The Court has upheld other federal laws that involved equally substantial, if not more substantial, incursions on the general police powers of the States and the autonomy of individuals. If, as *Wickard* shows, Congress could regulate the most self-sufficient of individuals—the American farmer—when he grew wheat destined for no location other than his family farm, the same is true for those who inevitably will seek health care and who must have a way to pay for it. And if Congress could regulate Angel Raich when she grew marijuana on her property for self-consumption, indeed for self-medication, *Raich*, 545 U.S. at 6–7, and if it could do so even when California law *prohibited* that marijuana from entering *any* state or national markets, it is difficult to see why Congress may not regulate the 50 million Americans who self-finance their medical

care. *See* U.S. Census Bureau, *Income, Poverty, and Health Insurance Coverage in the United States: 2009*, at 23 tbl. 8.

The individual mandate also steers clear of the central defect in the laws at issue in *Lopez* and *Morrison*. Health care and the means of paying for it are "quintessentially economic" in a way that possessing guns near schools, *see Lopez*, 514 U.S. 549, and domestic violence, *see Morrison*, 529 U.S. 598, are not. No one must "pile inference upon inference," *Lopez*, 514 U.S. at 567, to recognize that the national regulation of a $2.5 trillion industry, much of which is financed through "health insurance . . . sold by national or regional health insurance companies," 42 U.S.C. § 18091(a)(2)(B), is economic in nature. Nor does this approach remove all limits on the commerce power. As *Lopez* and *Morrison* suggest, a majority of the Court still appears to accept the line between regulating economic and non-economic conduct, which is why a general murder or assault statute would exceed congressional power. Measured by these conventional commerce clause benchmarks, the minimum-essential-coverage provision passes.

## C.

None of this matters, plaintiffs claim. However broad Congress's commerce power may be, it is not unlimited, and one limit on that power is that it applies only to individuals already engaged in commerce. The Clause permits the legislature to "regulate" commerce, not to create it. Put another way, it empowers Congress to regulate economic "activities" and "actions," not inaction—not in other words individuals who have never entered a given market and who prize that most American of freedoms: to be left alone.

### 1.

Of all the arguments auditioning to invalidate the individual mandate, this is the most compelling. The Court, for one, has never considered the validity of this type of mandate before, at least under the commerce power. True enough, *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964), sustained Congress's power to compel affirmative acts—to require the owner of any "inn, hotel, motel or other establishment

which provides lodging to transient guests" to offer lodging to all on non-discriminatory grounds. *Id.* at 247. But the Civil Rights Act of 1964 applies only to service providers *already in* the relevant interstate market. If covered entities offer lodging in interstate commerce, Congress tells them how to do so and requires action in the process. Congress did not try to solve this policy problem by compelling individuals to open inns in the first instance.

The same is true of the *Wickard* and *Raich* plaintiffs. The laws regulated individuals who chose to grow wheat and marijuana on their own—by punishing individuals who grew too much of one product (wheat) and any of the other (marijuana). In *Wickard* and *Raich*, it is true, the Court permitted Congress to regulate individuals who did not offer to buy or sell anything, who merely raised their crops and plants at home, who consumed them at home and who in one instance (*Raich*) were prohibited from buying and selling the product in any market. Yet that reality confirms only the breadth of the substantial-effects doctrine. It does not show that Congress may compel individuals to buy products they do not want.

Not only has the Court never crossed this line, neither has Congress, as the reports of two federal agencies confirm:

> (1) "The government has never required people to buy any good or service as a condition of lawful residence in the United States." CBO Memorandum, *The Budgetary Treatment of an Individual Mandate to Buy Health Insurance*, at 1 (Aug. 1994);

> (2) "[W]hether the individual responsibility requirement would be constitutional under the [Commerce Clause] is a challenging question, as it is a novel issue whether Congress may use the clause to require an individual to purchase a good or a service." Congressional Research Service, *Requiring Individuals to Obtain Health Insurance: A Constitutional Analysis*, at 8–9 (Oct. 15, 2010).

The efforts of the government and its *amici* to counter this point serve only to confirm it. That Congress may conscript individuals to serve in the military, 50 U.S.C. app. § 453(a), or to pay taxes, *see* 26 U.S.C. §§ 7201 *et seq.*, proves only that Congress may require individuals to undertake tasks under other enumerated powers, not under the

commerce power. That the Second Congress not only required certain individuals to serve in the military but to arm themselves as well (by purchasing a gun and ammunition), Second Militia Act of 1792, 1 Stat. 271, § 1, comes to the same end: It amounts to a necessary, proper and utterly sensible means of implementing Congress's authority to raise an army. To argue that Congress's power to enlist individuals to defend the country's borders proves that it may enlist individuals to improve the availability of medical care gives analogy a bad name. There is a difference between drafting a citizen to join the military and forcing him to respond to a price quote from Aetna.

One other point dignifies the plaintiffs' argument. Legislative novelty typically is not a constitutional virtue. More than once, and quite often in separation-of-powers cases, the Court has said that a "[l]ack of historical precedent can indicate a constitutional infirmity" in a congressional act. *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. __, 131 S. Ct. 1632, 1641 (2011); *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. __, 130 S. Ct. 3138, 3159 (2010) ("Perhaps the most telling indication of the severe constitutional problem with the PCAOB is the lack of historical precedent for this entity."); *Printz v. United States*, 521 U.S. 898, 905 (1997) ("[I]f . . . earlier Congresses avoided use of this highly attractive power, we would have reason to believe that the power was thought not to exist.").

2.

The plaintiffs thus present (1) a theory of constitutional invalidity that the Court has never considered before, (2) a legislative line that Congress has never crossed before, and (3) a theory of commerce power that has the potential to succeed where others have failed: by placing a categorical cap on congressional power. Why not accept the invitation?

The first point proves only that the Supreme Court has considerable discretion in resolving this dispute. It does not free lower court judges from the duty to respect the language and direction of the Court's precedents, particularly in view of the reality that this law has the purpose and effect of regulating commerce and in view of the save-

before-destroy imperatives of reviewing facial challenges. The Supreme Court can decide that the legend of *Wickard* has outstripped the facts of *Wickard*—that a farmer's production only of *more than* 200 bushels of wheat a year substantially affected interstate commerce. *See Wickard*, 317 U.S. at 114. A court of appeals cannot. The Supreme Court can decide that *Raich* was a case only about the fungibility of marijuana, *see Raich*, 545 U.S. at 18–19, not a decision that makes broader and more extravagant assertions of legislative power more impervious to challenge. A court of appeals cannot.

The second point favors the claimants, but it does not dispose of the case. The novelty of the individual mandate may indeed suggest it is a bridge too far, but it also may offer one more example of a policy necessity giving birth to an inventive (and constitutional) congressional solution. The substantial-effects doctrine invites, rather than discourages, unconventional laws, making it difficult to draw conclusions from a legislative effort to shoehorn a new policy initiative into such a capacious theory of federal power.

The third point is the critical one: Does the Commerce Clause contain an action/inaction dichotomy that limits congressional power? No—for several reasons. *First*, the relevant text of the Constitution does not contain such a limitation. To the extent "regulate," "commerce," "necessary" and "proper" might be words of confinement, the Court has not treated them that way, as long as the objects of federal legislation are economic and substantially affect commerce. All three methods of paying for medical care (private insurance, public insurance and self-insurance) meet this modest requirement. And if Congress may prescribe rules for some of these methods of payments, as plaintiffs seem to agree, it is difficult to see why these words prohibit it from doing the same for all three.

*Second*, the promise offered by the action/inaction dichotomy—of establishing a principled and categorical limit on the commerce power—seems unlikely to deliver in practice. Level of generality is destiny in interpretive disputes, and it remains unclear at what level plaintiffs mean to pitch their action/inaction line of constitutional authority or indeed whether a workable level exists. Does this test apply to individuals who have

purchased medical insurance before?  Those individuals have not been inactive in any sense of the word when it comes to the medical-insurance market, yet plaintiffs say that Congress may not regulate them.

What of individuals who voluntarily have insurance on the day the mandate goes into effect?  One of the plaintiffs in this case, Jann DeMars, now has insurance, yet she claims Congress has no right to require her to *maintain* that coverage.  It is not clear what the action/inaction line means in a setting in which an individual voluntarily (and actively) obtains coverage and is required only to maintain it thereafter.  As to this group of individuals, why can't Congress regulate them, even under plaintiffs' theory of the case?  We no longer are talking about a mandate imposed on the mere status of "existence" in the United States but on individuals who have voluntarily purchased medical insurance in an interstate market and who must maintain only what they chose to buy.  At a minimum, this application of the law is constitutional.

How would the action/inaction line have applied to Roscoe Filburn?  Might he have responded to the Agricultural Adjustment Act of 1938 by claiming that the prohibition on planting more than 11.1 acres of wheat on his farm compelled him to action—to buy wheat in the interstate market so that he could feed *all* of his animals?  And is it any more offensive to individual autonomy to prevent a farmer from being self-sufficient when it comes to supplying feed to his animals than an individual when it comes to paying for health care?  It seems doubtful that the *Wickard* Court would have thought so.  *See Wickard*, 317 U.S. at 129 (acknowledging that the law "forc[ed] some farmers into the market to buy wheat they could provide for themselves").  How would the action/inaction line apply if someone like Angel Raich sold her house, marijuana plants and all?  The Controlled Substances Act would obligate the new owner to act (by removing the plants), *see* 21 U.S.C. § 844, but it seems doubtful that he could sidestep this obligation on the ground that the law forced him to act rather than leaving him alone to enjoy the fruits of inaction.

There is another linguistic problem with the action/inaction line.  The power to regulate includes the power to prescribe and proscribe.  *See Lottery Case*, 188 U.S. 321,

359–60 (1903).  Legislative prescriptions set forth rules of conduct, some of which require action.  *See, e.g.*, 18 U.S.C. § 2250 (sex-offender registration); *id.* § 228 (child-support payments); *see also United States v. Faasse*, 265 F.3d 475, 486–87 (6th Cir. 2001) (en banc).  The same is true for legislative proscriptions.  Take the drug laws at issue in *Raich*, where Congress regulated by prohibiting individuals from possessing certain drugs.  A drug-possession law amounts to forced inaction in some settings (those who do not have drugs must not get them), and forced action in other settings (those who have drugs must get rid of them).

An enforceable line is even more difficult to discern when it comes to health insurance and the point of buying it:  financial risk.  Risk is not having money when you need it.  And the mandate is one way of ensuring that all Americans have money to pay for health care when they inevitably need it.  In this context, the notion that self-insuring amounts to inaction and buying insurance amounts to action is not self-evident.  If done responsibly, the former requires more action (affirmatively saving money on a regular basis and managing the assets over time) than the latter (writing a check once or twice a year or never writing one at all if the employer withholds the premiums).  What is more, inaction *is* action, sometimes for better, sometimes for worse, when it comes to financial risk.  When Warren Buffett tells shareholders that "[w]e continue to make more money when snoring than when active" or that "[i]nactivity strikes us as intelligent behavior," Chairman's Letter to Shareholders (Feb. 28, 1997), ¶¶ 72–73, *available at* http://www.berkshirehathaway.com/letters/1996.html, he is not urging the Board of Directors to place him in a Rip Van Winkle-like stupor for the next year.  He is saying that, of the many buy and sell recommendations that came across his desk that year, the best thing he could have done is the informed, even masterful, inaction of saying no to all of them.

No one is inactive when deciding how to pay for health care, as self-insurance and private insurance are two forms of action for addressing the same risk.  Each requires affirmative choices; one is no less active than the other; and both affect commerce.  In affidavits filed in this case, the individual plaintiffs all mention the need

to make current changes in their spending and saving practices to account for the need to pay for medical insurance in the future. Saving to buy insurance or to self-insure, as these affidavits attest, involves action. *E.g.*, Ceci May 27, 2011 Decl., ¶ 7 ("Due to the added financial pressure [of the mandate], I have cut back on discretionary spending, such as costs associated with entertainment, like going to the movies, a restaurant, or sporting events."); Hyder May 28, 2011 Decl., ¶ 8 (same).

How, moreover, would an action/inaction line work with respect to individuals living in States that already mandate the purchase of medical insurance or States that conceivably might do so in the future if the mandate is invalidated? One of the central premises of the claimants' argument is that, under the Framers' design, the regulation of health care and health insurance is primarily, if not exclusively, a prerogative of the States. That is why the claimants presumably believe that, when the States exercise this power, they have broad discretion to try out different ways to regulate health care. And that is why the claimants apparently have no constitutional objection to States that seek to solve this problem with individual mandates or something similar. Yet individuals in such States already would have entered the health-insurance market, permitting Congress to regulate them further by increasing the minimum coverage already required by state law or by requiring them to comply with other components of the Affordable Care Act. How strange that individuals who live in States with mandates would be subject to federal regulation but others would not be—with the difference in treatment having little to do with the concerns about federal intrusions on individual autonomy that led to this challenge in the first place. How strange, too, that, if other States opted to enact individual mandates in the future, the federal commerce power would spring into existence as to individuals living there.

Strange or not, this theory of commerce power at a minimum creates a serious hurdle for a facial challenge. If nothing else, it suggests that the minimum-essential-coverage provision is constitutional as applied to individuals living in States with mandates, undermining the notion that the mandate is unconstitutional in all of its applications.

What of individuals who voluntarily purchased bare-bones insurance before the mandate's effective date—*e.g.*, catastrophic-care insurance or high-deductible insurance—but are required by the minimum-essential-coverage provision to obtain more insurance?  The action/inaction line means nothing to them, establishing another class of individuals against whom Congress could apply the law and presenting another impediment to a facial challenge.

*Third*, a variation on the action/inaction line—between regulating individuals already in markets and those outside of them—does not seem to work, at least in view of *Raich* and *Filburn*.  Angel Raich and Roscoe Filburn never entered *any* markets, whether interstate or intrastate, yet Congress regulated them nonetheless.  That is why the decisions upholding this regulatory authority are so far-reaching.  To the extent both individuals still *did* something (grew wheat or marijuana), that takes us back to the action/inaction line and the problems associated with it.

*Fourth*, still another variation on the action/inaction line—that forced purchases of medical insurance do not amount to "proper" means of regulation, even if Congress could reasonably find them "necessary"—does not seem to work either.  One component of the Act and one alternative way of addressing the topic suggest why.  Instead of requiring Americans to obtain general medical insurance, the legislature might have required them to buy just catastrophic-care insurance.  Here we have a problem—a serious illness or accident—that most people will experience directly themselves or indirectly through a family member at some point in their lives, and one that virtually no one can afford based on current income and savings.  One federal law, the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, and several state laws, *see, e.g.*, Wash. Rev. Code § 70.170.060; *Walling v. Allstate Ins. Co.*, 455 N.W.2d 736, 738 (Mich. Ct. App. 1990), require hospitals to accept many of these patients without regard to their capacity to pay, and a culture of compassion leads hospitals and doctors to treat many others in the same way.  Through EMTALA, Congress subsidizes some of these costs.  42 U.S.C. §§ 1395cc, 1395dd.  Hospitals and

doctors internalize other costs, and they share still others by raising prices. *See id.* § 18091(a)(2)(F).

If Congress has the power to regulate the national healthcare market, as all seem to agree, it is difficult to see why it lacks authority to regulate a unique feature of that market by requiring all to pay now in affordable premiums for what virtually none can pay later in the form of, say, $100,000 (or more) of medical bills prompted by a medical emergency. Still more difficult to see is the idea that the word "proper" imposes such a limitation. When Congress guarantees a benefit for all (by securing certain types of medical care), it may regulate that benefit (by requiring some to pay for it). One component of the Affordable Care Act, as it turns out, does this very thing: It allows those under 30 to purchase catastrophic-care insurance, and nothing more. *See* 42 U.S.C. § 18022(e); 26 U.S.C. § 5000A(f)(1). This feature of the law does not exceed congressional power, further showing that the mandate is not unconstitutional in all of its applications.

Congress also would have acted within its commerce power had it opted to regulate insurance coverage at the point of sale, and the word "proper" would not have gotten in the way. The legislature could have said that when non-exempt individuals obtain health care, they are put to a choice: either pay for the care or buy medical insurance from then on. This approach would impose a federal condition (ability to pay) on the consumption of a service bound up in federal commerce (medical care). Yet such a law would be at least as coercive as the individual mandate, and arguably more so. An individual in need of acute medical care, but without the resources to pay for it, is not apt to refuse to buy future medical insurance in order to obtain present care, and a family member (if responsible for the choice) is even less likely to do so. The Act, by contrast, does not regulate individuals at a time of crisis. And it does not compel individuals to buy insurance or even use insurance. They may pay a penalty instead, which in the first several years of the Act, if not throughout its existence, normally will cost less than medical insurance. *See* 26 U.S.C. § 5000A(c). If one of these laws is legitimate, so it would seem is the other. Requiring insurance today and requiring it at a future point of sale amount to policy differences in degree, not kind, and not the sort of policy

differences removed from the political branches by the word "proper" or for that matter "necessary" or "regulate" or "commerce."

*Fifth*, the plaintiffs target the breadth of the mandate and Congress's decision to regulate *all* of the self-insured together rather than only those who demonstrate an incapacity to pay for medical care and only those who are responsible for the cost-spreading and free-riding at which the Act takes aim. They have a point. Why apply the law to those who *can* pay for health care and those who *have* paid for health care in the past? Why impose a "penalty" on those who take care of themselves physically and financially? And why eliminate healthcare free-riding of one sort by compelling free-riding of another sort—by requiring those who paid for their health care in the past to subsidize the healthcare costs of others in the future? Instead of eliminating free-riding, the Act seems to lock it in place.

These objections, however, do not appear to establish a constitutional defect. Congress generally has broad authority under the commerce power to choose the class of people it wishes to regulate, *see Raich*, 545 U.S. at 26–27, permitting it to group all of the self-insured together, whether they have many assets available for medical care, very few, or something in between, particularly since the financial wherewithal of the self-insured is unlikely to stay put. Individuals lose jobs and obtain jobs, and the value of their assets goes up and goes down, making it appropriate (if perhaps unfair) to regulate this entire group together. The courts do not apply strict scrutiny to commerce clause legislation and require only an "appropriate" or "reasonable" "fit" between means and ends. *United States v. Comstock*, 560 U.S. __, 130 S. Ct. 1949, 1956–57 (2010). Regulating all of the self-insured together does not cross these lines. The Commerce Clause permits Congress to make flawed generalizations, and that at most is what might be said about the overbreadth of this law.

But even if that were not the case, even if the Constitution prohibited Congress from regulating all of the self-insured together, that would not require a court to invalidate the individual mandate in its entirety. It would show only that the law may be unconstitutional as applied to some individuals, not to all of them, and that suffices

to defeat a facial challenge. Nothing prevents such individuals from bringing as-applied challenges to the mandate down the road. As to the plaintiffs in today's case, they have filed only a pre-enforcement facial challenge, the very point of which is to make the particulars of their situation irrelevant to the constitutional inquiry. *See Doe v. Reed*, 561 U.S. __, 130 S. Ct. 2811, 2817 (2010).

*Sixth*, the anti-commandeering principle of the Tenth Amendment adds nothing new to this case. True, the Tenth Amendment reserves those powers not delegated to the National Government "to the States" and "to the people." True also, a critical guarantee of individual liberty is structural and judicially enforceable—preserving a horizontal separation of powers among the branches of the National Government, *INS v. Chadha*, 462 U.S. 919, 957–58 (1983), *and* a vertical separation of powers between the National Government and the States, *New York*, 505 U.S. at 181. Odd though it may seem in light of American history, States' rights sometimes *are* individual rights. *See Bond v. United States*, 564 U.S. __, No. 09-1227, slip op. at 9 (June 16, 2011). Doubt it? Go to any federal prison in the country to see how a broad conception of the commerce power has affected individual liberty through the passage of federal gun-possession and drug-possession laws and sentencing mandates.

But to the extent plaintiffs mean to argue that the Tenth Amendment contains its own anti-commandeering principle applicable to individuals and to *all* of Congress's enumerated powers, that is hard to square with the taxing power, which regularly commandeers individuals—in equally coercive ways—to spend money on things they may not need and to support policies they do not like. And to the extent plaintiffs mean to argue that such a principle captures (or reinstates) limitations on the meaning of "proper[ly]" "regulat[ing]" interstate "commerce," that takes us back to the points already made about Congress's delegated power in this area.

* * *

That brings me to the lingering intuition—shared by most Americans, I suspect—that Congress should not be able to compel citizens to buy products they do not want. If Congress can require Americans to buy medical insurance today, what of tomorrow? Could it compel individuals to buy health care itself in the form of an annual check-up or for that matter a health-club membership? Could it require computer companies to sell medical-insurance policies in the open market in order to widen the asset pool available to pay insurance claims? And if Congress can do this in the healthcare field, what of other fields of commerce and other products?

These are good questions, but there are some answers. In most respects, a mandate to purchase health insurance does not parallel these other settings or markets. Regulating how citizens pay for what they already receive (health care), never quite know when they will need, and in the case of severe illnesses or emergencies generally will not be able to afford, has few (if any) parallels in modern life. Not every intrusive law is an unconstitutionally intrusive law. And even the most powerful intuition about the meaning of the Constitution must be matched with a textual and enforceable theory of constitutional limits, and the activity/inactivity dichotomy does not work with respect to health insurance in many settings, if any of them.

The very force of the intuition also helps to undo it, as one is left to wonder why the Commerce Clause does the work of establishing this limitation. Few doubt that Congress could pass an equally coercive law under its taxing power by imposing a healthcare tax on everyone and freeing them from the tax if they purchased health insurance. If Congress may engage in the same type of compelling/conscripting/commandeering of individuals to buy products under the taxing power, is it not strange that only the broadest of congressional powers carves out a limit on this same type of regulation?

Why construe the Constitution, moreover, to place this limitation—that citizens cannot be forced to buy insurance, vegetables, cars and so on—solely in a grant of power to Congress, as opposed to due process limitations on power with respect to all American

legislative bodies?  Few doubt that the States may require individuals to buy medical insurance, and indeed at least two of them have.  *See* Mass. Gen. Laws 111M § 2; N.J. Stat. Ann. § 26:15-2.  The same goes for a related and familiar mandate of the States—that most adults must purchase car insurance.  Yet no court has invalidated these kinds of mandates under the Due Process Clause or any other liberty-based guarantee of the Constitution.  That means one of two things:  either compelled purchases of medical insurance *are* different from compelled purchases of other goods and services, or the States, even under plaintiffs' theory of the case, may compel purchases of insurance, vegetables, cars and so on.  Sometimes an intuition is just an intuition.

For now, whatever else may be said about plaintiffs' activity/inactivity theory of commerce power, they have not shown that the individual mandate exceeds that power in all of its applications.  Congress may apply the mandate in at least four settings:  (1) to individuals who already have purchased insurance voluntarily and who want to maintain coverage, but who will be required to obtain more insurance in order to comply with the minimum-essential-coverage requirement; (2) to individuals who voluntarily obtained coverage but do not wish to be forced (at some indeterminate point in the future) to maintain it; (3) to individuals who live in States that already require them to obtain insurance and who may have to obtain more coverage to comply with the mandate or abide by other requirements of the Affordable Care Act; and (4) to individuals under 30, no matter where they live and no matter whether they have purchased health care before, who may satisfy the law by obtaining only catastrophic-care coverage.  The valid application of the law to these groups of people suffices to uphold the law against this facial challenge.

While future challenges to the law have hills to climb, nothing about this view of the case precludes individuals from bringing as-applied challenges to the mandate as the relevant agencies implement it, and as the "lessons taught by the particular," *Sabri*, 541 U.S. at 608–09, prove (or disprove) that Congress crossed a constitutional line in imposing this unprecedented requirement.  Just as courts should refrain from needlessly

pre-judging the *invalidity* of a law's many applications, they should refrain from doing the same with respect to their *validity*.

Any remaining doubt about rejecting this facial challenge is alleviated by the most enduring lesson of *McCulloch*, which remains an historical, not a doctrinal, one. No debate in the forty years after the country's birth stirred the people more than the conflict between the federalists and anti-federalists over the role of the National Government in relation to the States. And no issue was more bound up in that debate than the wisdom of creating a national bank. In upholding the constitutionality of a second national bank, not a foregone conclusion, the Supreme Court erred on the side of allowing the political branches to resolve the conflict. Right or wrong, that decision presented the challengers with a short-term loss (by upholding the bank) and set the platform for a potential long-term victory (by allowing them to argue that Congress should not make the same mistake again). There was no third national bank. *But see* Federal Reserve Act, ch. 6, 38 Stat. 251 (1913).

Today's debate about the individual mandate is just as stirring, no less essential to the appropriate role of the National Government and no less capable of political resolution. Time assuredly will bring to light the policy strengths and weaknesses of using the individual mandate as part of this national legislation, allowing the peoples' political representatives, rather than their judges, to have the primary say over its utility.

_____

**CONCURRING IN PART AND DISSENTING IN PART**

_____

GRAHAM, Senior District Judge.  I concur with the majority's opinion as to standing and the Anti-Injunction Act, as well with Judge Sutton's opinion that the challenged statute is not an exercise of Congress's taxing power.  I write separately because I disagree with Judge Martin's Commerce Clause analysis and do not share Judge Sutton's view that plaintiffs' challenge is undone by *United States v. Salerno*, 481 U.S. 739, 745 (1987).

If Congress exceeded its authority by enacting the mandate, then the mandate is "legally stillborn" and cannot be valid in any application.  *Virginia v. Sebelius*, 728 F.Supp.2d 768, 774 (E.D. Va. 2010).  "There is no position which depends on clearer principles, than that every act of a delegated authority, contrary to the tenor of the commission under which it is exercised, is void.  No legislative act, therefore, contrary to the Constitution can be valid."  *The Federalist* No. 78 (A. Hamilton).  As cases in point, *Lopez* and *Morrison* struck down statutes as facially unconstitutional under the Commerce Clause and did so without reference to *Salerno*.  *United States v. Lopez*, 514 U.S. 549 (1995); *United States v. Morrison*, 529 U.S. 598 (2000).

**I.**

This case presents the issue whether Congress acted within its powers under the Commerce Clause when it passed legislation requiring nearly all citizens to maintain health insurance coverage beginning in 2014.  *See* Patient Protection and Affordable Care Act ("ACA") § 1501 (codified at 26 U.S.C. § 5000A(a)).  Individuals who fail to satisfy the "individual responsibility requirement" must pay a monetary penalty.  26 U.S.C. § 5000A(b)(1).

The mandate is a novel exercise of Commerce Clause power.  No prior exercise of that power has required individuals to purchase a good or service.  This fact alone does not answer the constitutional question, but it does highlight the need for judicial

scrutiny.  Federal courts have the duty to construe and enforce the "outer limits" of congressional power.  *Lopez*, 514 U.S. at 556-57 (finding the Gun-Free School Zones Act unconstitutional).

The Commerce Clause authorizes Congress "[t]o regulate Commerce . . . among the several States."  U.S. Const., Art. I, § 8, cl. 3.  The Supreme Court has interpreted the power as reaching three areas: (1) the channels of interstate commerce, (2) the instrumentalities of interstate commerce, and (3) "activities that substantially affect interstate commerce."  *Lopez*, 514 U.S. at 558-59.

Because the mandate regulates decisions not to purchase health insurance – conduct falling outside the ordinary sense of the word "commerce" (the trade or exchange of a good, *see Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 72 (1824)) – Congress expressly invoked the third category of Commerce Clause power as its authority for enacting the mandate.  *See* ACA § 1501(a)(1).  And in various suits across the nation challenging the constitutionality of the mandate, the government has consistently defended the mandate under Congress's power to regulate activities that substantially affect interstate commerce.

## II.

In evaluating the mandate's validity, one must  identify what market or conduct it regulates.  Plaintiffs argue that the health insurance market is the immediate subject of the mandate, while the government contends that the mandate represents but one component of the ACA's broader regulation of the market for health care services.

The challenged statute is a requirement to obtain health insurance.  The text of § 1501 reflects Congress's view that it was regulating the insurance market when it enacted the statute.  In the legislative findings, Congress found that the insurance requirement is what "substantially affects interstate commerce," ACA § 1501(a)(1), and it specifically noted that "*insurance* is interstate commerce subject to Federal regulation."  § 1501(a)(3) (emphasis added) (citing *United States v. South-Eastern Underwriters Ass'n*, 322 U.S. 533 (1944)).  The findings further state that the federal

government "has a significant role in regulating health insurance," § 1501(a)(2)(F), and the mandate will serve to "broaden the health insurance risk pool to include healthy individuals, which will lower health insurance premiums." § 1501(a)(2)(G). Moreover, the findings provide that "[t]he requirement is essential to creating effective health insurance markets that do not require underwriting and eliminate its associated administrative costs." § 1501(a)(2)(H).[1]

The government now attempts to recast the exercise of power as regulating the market for health care services. The ACA's numerous provisions seek to widen access to health care services and improve the quality of those services. The mandate itself rests among provisions aimed at reforming the health insurance market. *See* ACA, §§ 1001-1563. Other parts of the Act make changes to public programs like Medicaid, *see* §§ 2001-2955, and enact reforms intended to improve the quality and efficiency of health care, *see* §§ 3001-3602, strengthen the health care workforce, *see* §§ 5001-5701, and encourage innovative medical therapies, *see* §§ 7001-7103. The government argues that the mandate is best viewed as regulating one aspect – financing – of the overall health care market.

The government's argument for viewing the mandate as regulating health care in general suffers from many flaws. First, it gives "Congress a perverse incentive to legislate broadly pursuant to the Commerce Clause – nestling questionable assertions of its authority into comprehensive regulatory schemes – rather than with precision." *Gonzales v. Raich*, 545 U.S. 1, 43 (2005) (O'Connor, J., dissenting). Within the ACA as a whole, the mandate represents a separate exercise of congressional power. To say that the mandate simply concerns the financing end of health care proves the point – it is insurance that the mandate requires of all citizens.

Second, the government's argument ignores what Congress itself said about the mandate. Congress found that the insurance requirement in particular is what substantially affects interstate commerce, and it referenced a Supreme Court ruling that

---

[1] Congress has since amended the statutory section in which the legislative findings are codified, 42 U.S.C. § 18091, but the language quoted above remains unchanged.

the insurance industry is subject to Congress's Commerce Clause powers. As noted above, other findings in § 1501 demonstrate that Congress had its sights on the health insurance market. When Congress has spoken so clearly on the basis for its attempted exercise of power, the exercise should be judged on those terms, even if its ultimate conclusion need not be accepted at face value. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 311 (1981) (Rehnquist, J., concurring in judgment) ("Moreover, simply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.").

Third, the government's argument turns the mandate into something it is not. The requirement that all citizens obtain health insurance does not depend on them receiving health care services in the first place. Individuals must carry insurance each and every month regardless of whether they have actually entered the market for health services. Simply put, the mandate does not regulate the commercial activity of obtaining health care. It regulates the status of being uninsured.

### III.

Congress's legislative finding that the "individual responsibility requirement . . . substantially affects interstate commerce" turns the analysis on its head. ACA § 1501(a)(1). Without question, forcing all individuals to purchase a product that not everyone would otherwise purchase will have an effect on commerce. But Congress cannot be tolerated to justify its exercise of power by creating its own substantial effects. In determining whether the substantial effects test is satisfied, the focus must be on the existing economic activity Congress seeks to regulate, not on the impact the regulation would have. *See Wickard v. Filburn*, 317 U.S. 111, 125 (1942) (examining whether "appellee's activity," together with the activities of those similarly situated, "exerts a substantial economic effect on interstate commerce"); *Lopez*, 514 U.S. at 558-59 (holding that Congress may regulate an activity that substantially affects interstate commerce).

The inquiry then is whether plaintiffs' "activity," as it were, substantially affects interstate commerce. Much has been made in this litigation of the distinction between

activity and inactivity. The Supreme Court has often employed the word "activity" to describe the regulatory subjects of Congress's power over interstate commerce. *See Wickard*, 317 U.S. at 125; *Lopez*, 514 U.S. at 559; *Morrison*, 529 U.S. at 609-10; *Raich*, 545 U.S. at 17. Yet I do not interpret those cases as drawing a constitutional line between activity and inactivity. That distinction would suffer from the same failings as the "direct" and "indirect" effects test of prior Commerce Clause jurisprudence. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 36-38 (1937) (rejecting the direct/indirect distinction and stating that the question of Congress's authority is "necessarily one of degree"); *Lopez*, 514 U.S. at 579 (Kennedy, J., concurring) (noting that questions of constitutional law are often "not susceptible to the mechanical application of bright and clear lines"). Imposing an activity/inactivity line could hinder Congress in future cases from removing burdens on commerce that certain classes of individuals have passively enabled. *See United States v. Faasse*, 265 F.3d 475, 487 (6th Cir. 2001) (upholding the constitutionality of the Child Support Recovery Act and rejecting the argument that the willful failure to make a court-ordered, out-of-state child support payment from California to Michigan was insufficient for Commerce Clause purposes).

The inquiry should start by considering the "economic nature of the regulated activity." *Morrison*, 529 U.S. at 610; *see also Lopez*, 514 U.S. at 559-61 (finding that possession of a gun in a school zone was not an economic activity); *Raich*, 545 U.S. at 25 (finding that growing and consuming a crop was "quintessentially economic"). Congress here attempts to regulate a class of individuals who have refrained from purchasing health insurance. The conduct being regulated is the decision not to enter the market for insurance. Plaintiffs have not bought or sold a good or service, nor have they manufactured, distributed, or consumed a commodity. *See Raich*, 545 U.S. at 25-26 (defining "economics" as the "production, distribution, and consumption of commodities"). Rather, they are strangers to the health insurance market. This readily differentiates the present case from others cited by the government. *See Wickard*, 317 U.S. at 128 (Filburn cultivated wheat); *Raich*, 545 U.S. at 19 (Raich cultivated marijuana); *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 243 (1964)

(appellant operated a motel). Certainly there is an interstate market for health insurance, but, unlike the plaintiffs in *Wickard* and *Raich*, plaintiffs here have not entered the market. In no other instance has Congress before attempted to force a non-participant into a market.

The government contends that virtually every American has or will participate in the market for health care services. The timing of the need for health care can be unpredictable and the costs substantial. By not purchasing insurance, individuals like the plaintiffs have made a decision to accept risk. In the government's view, plaintiffs' financial planning choices and position on risk are quintessentially economic in nature because they inevitably lead to cost-shifting when the uninsured obtain care they cannot afford. The mandate concerns a failure to pay for services obtained, argues the government, not a failure to engage in economic activity.

This argument deftly switches the focus from the private, non-commercial nature of plaintiffs' conduct (the decision to be uninsured) to the perceived economic effects of their absence from the insurance market. Certainly, plaintiffs' conduct may be considered in the aggregate with the conduct of similarly-situated individuals, *see Raich*, 545 U.S. at 20; however, the Commerce Clause cannot be satisfied when economic activity is lacking in the first instance.[2] "Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained." *Lopez*, 514 U.S. at 560; *see also Morrison*, 529 U.S. at 611 ("[I]n those cases where we have sustained federal regulation of intrastate activity based upon the activity's substantial effects on interstate commerce, the activity in question has been some sort of economic endeavor."); *Raich*, 545 U.S. at 17 (Congress may regulate "purely local activities that

---

[2] Justice Scalia has stated that under the Necessary and Proper Clause, "Congress may regulate even noneconomic local activity if that regulation is a necessary part of a more general regulation of interstate commerce." *Raich*, 545 U.S. at 37 (Scalia, J., concurring).

I do not believe that this view of the Necessary and Proper Clause would save the mandate. As Judge Vinson correctly explained, an attempted exercise of power – the mandate – cannot be justified because it is "necessary" to cure the economic disruption caused another part of the legislation – the "guaranteed issue" provision, ACA § 1001. *See Florida v. United States Dep't of Health and Human Services*, __ F.Supp.2d __, 2011 WL 285683, at *31 (N.D. Fla. Jan. 31, 2011).

are part of an economic 'class of activities' that have a substantial effect on interstate commerce").

It is true that decisions not to purchase insurance are in some sense economic ones. They are choices about risk and finances. When viewed in the aggregate, these decisions have economic consequences. Congress, for instance, has found that:

> The cost of providing uncompensated care to the uninsured was $43,000,000,000 in 2008. To pay for this cost, health care providers pass on the cost to private insurers, which pass on the cost to families. This cost-shifting increases family premiums by on average over $1,000 a year. By significantly reducing the number of the uninsured, the requirement, together with the other provisions of this Act, will lower health insurance premiums.

42 U.S.C. § 18091(F). In an *amicus* brief, certain economic scholars point to other cost-shifting effects caused by decisions to be uninsured. The first relates to adverse selection, or the positive correlation between demand for insurance and the risk of loss. When healthy individuals opt not to buy insurance, the pool of insured persons is smaller and less healthy as a whole, thus raising premiums. Second, when previously uninsured individuals do obtain insurance, they tend to do so when they have a significant medical need and thereby consume more and costlier services.

*Lopez* and *Morrison* rejected a view of causation whereby the cost-shifting to society caused by violent conduct can satisfy the substantial effects test. *See Lopez*, 514 U.S. at 564 (rejecting the government's "costs of crime" and loss of "national productivity" reasoning); *Morrison*, 529 U.S. at 615 (same). The government fails to show why a view of cost-shifting caused by risky conduct should fare any better. The problem with the government's line of reasoning here is that it has no logical end point, and it illustrates precisely Justice Thomas's concerns with the substantial effects test. *See Morrison*, 529 U.S. at 627 (Thomas, J., concurring) (calling the test "rootless and malleable"). That test, when paired with the aggregation principle, invites manipulation and "draw[ing] the circle broadly enough to cover an activity that, when taken in isolation, would not have substantial effects on commerce." *Lopez*, 514 U.S. at 600 (Thomas, J., concurring).

The government insists that a decision not to buy insurance is more clearly financial in nature than the acts of crime at issue in *Lopez* and *Morrison*. But the statutes struck down in *Lopez* and *Morrison* at least waited to impose their criminal penalties until the commission of the acts that allegedly caused the cost-shifting. Here, several layers of inferences must materialize for the government's cost-shifting reasoning to work, but the mandate waits for none of them. *See Lopez*, 514 U.S. 567 (rejecting as too attenuated a substantial effects theory that "pile[s] inference upon inference"). The mandate and its penalty are not conditioned on the failure to pay for health care services, or, for that matter, conditioned on the consumption of health care. Congress instead choose a more coercive and intrusive regulation. The proper object of Congress's power is interstate commerce, not private decisions to refrain from commerce.

The ACA represents Congress's attempt to solve national problems in the health insurance market. That problems are felt nationwide does not mean that Congress can try to solve them in any fashion it pleases. Congress must choose from the limited powers granted to it by the Constitution, and federal courts have a duty to uphold the Constitution when Congress has exceeded its authority. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803) ("This is of the very essence of judicial duty."). *Lopez* and *Morrison* firmly establish that the Commerce Clause power is "not without effective bounds." *Morrison*, 529 U.S. at 608 (citing *Lopez*, 514 U.S. at 557)); *see also Lopez*, 514 U.S. at 574 (Kennedy, J., concurring) ("[T]he Court as an institution and the legal system as a whole have an immense stake in the stability of our Commerce Clause jurisprudence as it has evolved to this point.").

The "hard work for courts" is identifying "objective markers for confining the analysis in Commerce Clause cases." *Raich*, 545 U.S. at 47 (O'Connor, J., dissenting). When dealing with the outer limits of Congress's powers, "first principles" must be heeded. *See Lopez*, 514 U.S. at 552. The federal government is one of enumerated powers. Congress's authority must have limits, lest the Tenth Amendment's reservation of powers to the States and the people be without meaning. Principles of federalism thus should guide a court's examination of novel exercises of Commerce Clause power. *See*

*id*. at 580 (Kennedy, J., concurring) ("[W]e must inquire whether the exercise of national power seeks to intrude upon an area of traditional state concern."); *Raich*, 545 U.S. at 48 (O'Connor, J., dissenting) (noting that "fundamental structural concerns about dual sovereignty animate our Commerce Clause cases").

Here, Congress's exercise of power intrudes on both the States and the people. It brings an end to state experimentation and overrides the expressed legislative will of several states that have guaranteed to their citizens the freedom to choose not to purchase health insurance. *See* Idaho Code Ann. § 39-9003; Utah Code Ann. § 63M-1-2505.5; Va. Code Ann. § 38.2-3430.1:1. The mandate forces law-abiding individuals to purchase a product – an expensive product, no less – and thereby invades the realm of an individual's financial planning decisions. *Cf. Maryland v. Wirtz*, 392 U.S. 183, 196 n.27 (1968) ("Neither here nor in *Wickard* had the Court declared that Congress may use a relatively trivial impact on commerce as an excuse for broad general regulation of state or private activities."). In the absence of the mandate, individuals have the right to decide how to finance medical expenses. The mandate extinguishes that right.

Congress may of course provide incentives (in the Tax and Bankruptcy Codes, for instance) to steer behavior, and it may impose certain requirements or prohibitions once an individual decides to engage in a commercial activity. *See*, *e.g.*, *Wickard*, *supra* (Congress had power to impose a harvesting limit on farmer who grew wheat); *Heart of Atlanta Motel*, *supra* (Congress had power to impose anti-discrimination requirement on individual who operated a motel). It is a different matter entirely to force an individual to engage in commercial activity that he would not otherwise undertake of his own volition.

The government recites the common refrain that the health insurance market is unique and attributes this to some blend of free-riding, adverse selection, universal participation, and unpredictability as to when and how much care might be needed. This should comfort the court, the government says, because Congress will not need to resort to such measures as the mandate again, or at least not very often.

This assurance is troubling on many levels and should hardly be heard to come from a body with limited powers. The uniqueness that justifies one exercise of power becomes precedent for the next contemplated exercise. And permitting the mandate would clear the path for Congress to cause or contribute to certain "unique" factors, such as free-riding and adverse selection,[3] and then impose a solution that is ill-fitted to the others.[4]

To the fatalistic view that Congress will always prevail and courts should step back and let the people, if offended, speak through their political representatives, I say that "courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority." *The Federalist* No. 78 (A. Hamilton). In this arena, the "public force" is entrusted to the courts. Oliver Wendell Holmes, *The Path of the Law*, 10 Harv. L. Rev. 457, 457 (1897). "[W]here the will of the legislature, declared in its statutes, stands in opposition to that of the people, declared in the Constitution, the judges ought to be governed by the latter rather than the former." *The Federalist* No. 78.

This is the "hard work" Justice O'Connor referred to in her dissent in *Raich*. It is hard work in part because it can place a federal court in the position of choosing between powerful competing political ideologies with the risk that the court's judgment may be branded as "political." We must not lose sight of the fact however that the Constitution we interpret and apply itself embodies a resolution of powerful competing political ideologies, including the extent of the power of the federal government – a resolution that the States and the people accepted in the ratification process. *See The Federalist* No. 45 (J. Madison) ("The powers delegated by the proposed Constitution to

---

[3] The free-riding problem is substantially one of Congress's own creation, *see* Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (requiring hospitals with emergency departments to provide the care necessary to stabilize patients with emergency medical conditions, without regard to a patient's ability to pay for the care received), and the adverse selection problem will be exacerbated by the guaranteed issue provision, in that supply will be guaranteed to high-risk individuals. Though these policies might be reasonable, Congress's compassion does not allow it to exceed the limits of its constitutional powers.

[4] Again, the mandate does not wait until an individual participates in the market for health care.

the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.").

In *Lopez* the Supreme Court recognized that the direction of its existing Commerce Clause jurisprudence threatened the principle of a federal government of defined and limited powers, and it began the process of developing a new jurisprudence more compatible with the Constitution. That process was interrupted by *Raich*, where a majority of the Court was unwilling to expressly overrule a landmark Commere Clause case in *Wickard*, which had been the law of the land for over sixty years.

Notwithstanding *Raich*, I believe the Court remains committed to the path laid down by Chief Justice Rehnquist and Justices O'Connor, Scalia, Kennedy, and Thomas to establish a framework of meaningful limitations on congressional power under the Commerce Clause. The current case is an opportunity to prove it so.

If the exercise of power is allowed and the mandate upheld, it is difficult to see what the limits on Congress's Commerce Clause authority would be. What aspect of human activity would escape federal power? The ultimate issue in this case is this: Does the notion of federalism still have vitality? To approve the exercise of power would arm Congress with the authority to force individuals to do whatever it sees fit (within boundaries like the First Amendment and Due Process Clause), as long as the regulation concerns an activity or decision that, when aggregated, can be said to have some loose, but-for type of economic connection, which nearly all human activity does. *See Lopez*, 514 U.S. at 565 ("[D]epending on the level of generality, any activity can be looked upon as commercial."). Such a power feels very much like the general police power that the Tenth Amendment reserves to the States and the people. A structural shift of that magnitude can be accomplished legitimately only through constitutional amendment.